PITTSBURGH TERMINAL
CORPORATION

v.

The BALTIMORE & OHIO RAILROAD
COMPANY, the Chesapeake & Ohio
Railway Company and Chessie System,
Inc.

Civ. A. No. 77–1455.

United States District Court,
W. D. Pennsylvania.

March 7, 1978.

B. A. Karlowitz, Pittsburgh, Pa., for plaintiff.

Richard T. Wentley, Pittsburgh, Pa., for defendants.

## MEMORANDUM OPINION

KNOX, District Judge.

This is an action brought by plaintiff holder of convertible debentures in the Baltimore and Ohio Railroad Company against the company and others involved for alleged violations of Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j):

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

and violation of Rule 10(b)(5) of the Commission issued thereunder.[1]

The court has held two days of hearings on an application by plaintiff for a preliminary injunction to restrain the payment of a dividend in kind declared upon the stock of the Baltimore and Ohio Railroad Company declared December 13, 1977. On this date the Board of B&O declared this dividend payable on a share per share basis in stock of Mid-Allegheny Corporation a wholly owned subsidiary of B&O. The dividend was payable to holders of record on that same day December 13, without any notice or warning of any kind to the holders of convertible debentures of B&O.

The evidence shows that plaintiff was the holder of $94,000 of convertible debentures of the B&O out of a total of $13,122,000 outstanding. These debentures are payable on January 1, 2010 and are convertible at any time into shares of B&O at $100 per share of common stock. B&O at the time in question had outstanding 2,535,565 shares which were traded on the New York Stock Exchange, of which 99.63% are owned or controlled by the Chesapeake and Ohio Railway Company, a Virginia corporation which in turn is wholly controlled by Chessie System Inc., another Virginia corporation having its principal place of business in Cleveland, Ohio. Plaintiff in addition to its holdings of convertible debentures has 400 shares of B&O resulting from prior conversions of convertible debentures.

Plaintiff through its president Monroe Gutman had noticed that the cash position of B&O had improved so that a dividend was indicated during the year 1977 and it had made prior inquiries of the defendants as to whether a dividend was considered so that he could take proper steps to determine whether to convert his convertible debentures into common stock and thus share in the dividend. Correspondence received from the officers indicated that they would send Gutman a press release if a dividend was declared. However, it appears that plaintiff was considering a cash dividend and it was to that that the attention of the defendants' officers had been directed.

Plaintiff had no information and has not yet received any information as to the market value of the assets of Mid-Allegheny Corporation. This corporation has extensive holdings of real estate and we know for certain that it has 35,000 acres of non-rail land (real estate not necessary to rail transportation) plus 32,000 acres of timber and

---

1. "It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, *in connection with the purchase or sale of any security.*"

other real estate holdings. The shares of Mid-Allegheny Corporation were carried on the books of B&O at a book value of $5,000 and the books also showed an advance of $1,700,000 to Mid-Allegheny by B&O. Plaintiff's exhibits 21 and 26 indicate that the value on the books of Mid-Allegheny Corporation of its real estate was $30.3 million dollars. But again this is book value and we have no knowledge of the market value. At the time of hearing a voluminous mass of records was produced to the plaintiff which is going to take considerable time to digest to determine if any further knowledge can be secured as to the market value of Mid-Allegheny's real estate which is covered by the stock dividend. One sale of Mid-Allegheny real estate had been made during the year 1977 resulting in a market price ten times book value which would be some indication the actual value of Mid-Allegheny stock is several times the book value. If plaintiff had had an opportunity to convert its debentures into shares prior to December 13, 1977, these shares of course would have participated in the dividend in kind declared in stock of Mid-Allegheny Corporation.

Plaintiff corporation had no knowledge of pendency of proceedings by B&O to declare the dividend in kind in stock of Mid-Allegheny until after the event when a press release in the Wall Street Journal was noted by plaintiff's president on December 14, 1977. This suit was filed December 28, 1977. It is apparent that plaintiff had no information relative to the proposed declaration of this dividend in kind in Mid-Allegheny shares and no opportunity to convert prior to the record date since the record date was the same as the declaration date, viz: December 13. Plaintiff corporation claims it is customary in corporations to set a record date later than the declaration date although no requirement to this effect has been shown. It was shown on the same date Western Maryland Company an affiliated corporation declared a stock dividend to shareholders of record December 31, 1977, which would have given the holders of convertible debentures a chance to convert.

It appears that the declaration of the dividend in kind in shares of Mid-Allegheny Corporation upon the stock of B&O was part of the restructuring of the Chessie and B&O Systems, one purpose being to avoid ICC restrictions on financing and another to place the non-rail real estate in a corporation managed by experts to produce the highest return. Since the Chessie System holds 99.639% of B&O stock it is apparent that nearly all the shares of Mid-Allegheny included in this dividend will go to Chessie System via its subsidiary C&O Railway Company and it is stated that it is its intention to donate these shares to Chessie Resources Corporation a wholly owned real estate subsidiary of the Chessie System.

The tax effect of the declaration of this dividend in kind in Mid-Allegheny stock on the B&O stockholder recipients is not clear. The defendant claims it is not taxable either to the minority shares in B&O Railway Company or to the Chessie System although no one can say with confidence what position the Internal Revenue Service might take in this complex tax area involving partial liquidating dividends, dividends in the course of reorganization. The court declines an invitation to speculate on this inasmuch as we have sufficient on our hands to decide the instant controversy.

It is claimed that the issuance of this dividend in kind is in addition to being violative of 10(b)(5), a violation of Article V, Section 12 of the indenture pursuant to which the convertible debentures were issued which is attached as exhibit A to the defendants' answer. In this it is provided in Article V Section 12:

"The Company covenants and agrees that it will not declare and/or pay any dividend on its common stock payable in stock or create any rights to subscribe for stock or securities convertible into stock unless in any such case notice of the taking of a record date for the determination of the stockholders entitled to receive such dividend, distribution or right is given at least ten days prior thereto by at least one publication in an Authorized Newspaper. A copy of such published

notice shall promptly after such publication be filed with the Trustee."

It is not readily clear as to whether this restriction against dividends payable in stock pertains to a dividend payable in stock of the company or whether it includes also dividends in kind payable in stock of other companies and it is claimed that notice was published once iñ an authorized newspaper published in Baltimore, which publication plaintiff of course had no knowledge. In any event, since there was no actual notice or knowledge and the defendants in paragraph 15 of their answer denied they had any duty to notify plaintiff of the declaration of this type of dividend, we can lay this aside at least for the present except to the extent that it forms part of the picture in determining whether there has been a violation of 10(b)(5).

The tests for determining whether to grant a preliminary injunction in this circuit have very clearly been set forth in *Delaware River Port Authority v. Trans American Trailer Transp. Co.*, 501 F.2d 917 (3d Cir. 1974) wherein the court said:

"In measuring the district court's consideration of appellants' motions for preliminary injunctive relief, we recognize that the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court 'should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest'."

### (1) Likelihood of Success.

We are met at the threshold in determining likelihood of success upon the merits with the question of whether this is a purchase or sale of securities as covered by 10(b)(5) in accordance with the decision of the U. S. Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). De-fendants strenuously contend that in the instant case there was neither purchase nor sale of a security as required by *Blue Chips* for the purpose of application of 10(b)(5), that all we have here is a holder of a convertible debenture which he did not convert because he did not know the value of the assets included in the stock of Mid-Allegheny Corporation and since there was no conversion there was neither purchase or sale of any security. Defendants rely heavily upon the case of *Broad v. Rockwell International Corp.*, 1977 Federal Securities Law Reporter ¶ 96193 (N.D.Tex. 8/19/77) in which there was a claim that the corporation had omitted to disclose certain material facts to the purchasers of certain convertible debentures of the company with respect to a merger. A Texas District Court in a brief decision consisting of findings of fact found that there was no evidence of scienter as required under *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that the indenture rights of the debenture holders were fully respected and that the wrongs complained of did not occur in connection with the purchase or sale of a security under *Blue Chips*, supra.

This court declines to follow *Broad v. Rockwell Internatl* and instead holds that the best exposition in this area relative to rights of convertible debenture holders is contained in the decision of Judge Tenny of the Southern District of New York in *Green v. Hamilton International Corp.*, 437 F.Supp. 723 (9/29/77).

*Blue Chips*, supra, involved offerees of a stock offering made pursuant to an antitrust consent decree. The offerees had neither purchased nor sold any of the offered shares. The court determined the rule as to this was correctly stated in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952). The cause of action under 10(b)(5) was based on a claim that the prospectus was overly pessimistic with respect to the financial prospects of the corporation and therefore the offerees did not take advantage of a chance to purchase the stock. The court plainly held that under 10(b)(5)

suit cannot be brought without having bought or sold stock or having contractual rights to this effect.

The court in arriving at this conclusion noted that *Birnbaum* was a judicially created right to bring suit under 10(b)(5) and that the results of allowing persons who had not bought or sold any of the stock of the company but had merely been dissuaded from purchasing because of prospectuses, news reports or other information which they claimed were unduly pessimistic would be followed by a deluge of suits claiming retrospectively that they had allowed golden opportunities to pass.

This case is not that type at all however and the court further said on page 749 of 421 U.S., on page 1932 of 95 S.Ct.: "However it noted that prior cases have held that persons owning contractual rights to buy or sell securities are not excluded by the *Birnbaum* rule". That is the situation existing in this case where the holders of convertible debentures had a contractual right to convert into stock of the B&O Railroad Company pursuant to the terms of the indenture.

Specifically with respect to the situation existing in this case the court by Mr. Justice Rehnquist significantly said on page 751 of 421, on page 1932 of 95 S.Ct.:

"Unlike respondent, which had no contractual right or duty to purchase Blue Chip's securities, the holders of puts, calls, options, and other contractual *rights or duties* to purchase or sell securities have been recognized as 'purchasers' or 'sellers' of securities for purposes of Rule 10b–5, not because of a judicial conclusion that they were similarly situated to 'purchasers' or 'sellers,' but because the definitional provisions of the 1934 Act themselves grant them such a status."

 It may be said that a holder of a convertible debenture has an option while the debenture is outstanding to convert into shares of the issuing corporation and certainly manipulative devices to deter or dissuade optionees from acting would and should come within the scope of 10(b)(5). We therefore hold that a situation such as exists here was envisaged as a case where a cause of action under 10(b)(5) could be brought. The court's reading of *Blue Chip Stamps* is that plaintiff in this case does have standing within the meaning of 10(b)(5) inasmuch as he had a contract right to purchase the common stock of B&O Railroad Company. Defendants however contend that since plaintiff has not alleged that he would have converted some or all of his debentures had it known of the declaration of the dividend in kind prior to the record date, that this would permit any person who alleges he would have purchased defendants' shares had he known the dividend would be delivered to sue contrary to the purchaser seller rule of *Blue Chips*. The holding in *Blue Chips* itself however as elucidated by *Green*, supra and infra, precludes this result. We hold that a potential purchaser or seller can bring an action under 10(b)(5) if and only if he has a contract right to purchase or sell and thus the possibility of unlimited suits by potential purchaser sellers is foreclosed.

In the *Green* case in what this court regards as a well-reasoned decision by Judge Tenny, the case came before the court on a motion to dismiss. Plaintiff's debentures were redeemed on October 31 (November 1, 1976). At any time prior to this redemption date, plaintiff could have converted his shares into stock. As the result of failure to convert he lost a chance to participate in a merger which was announced November 4, 1976. The court held that under the decision in *Blue Chips*, the holders of the convertible debentures could bring a cause of action under 10(b)(5) notwithstanding the argument that there was neither a purchase nor a sale of a security involved. The court pointed out that a debenture is a security under Section 3(a)(10) of the Act and that the plaintiffs clearly were possessed of a contractual right to acquire corporate stock. The *Green* court stated that *Blue Chips* had specifically acknowledged that holders of contractual rights to purchase have standing to sue in contradistinctions to the *Blue Chips* plaintiffs who were merely non-pur-

chasing offerees and quoted the language heretofore quoted by this court from *Blue Chips.*

■ The court also called attention to the decision in *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) where the Supreme Court had found a 10(b)(5) violation and had directed that 10(b) "be read flexibly, not technically and restrictively". "Since there was a 'sale' of a security and since fraud was used 'in connection with' it there is redress under Section 10(b)." We therefore hold in the instant case that plaintiffs have standing to sue under 10(b)(5). We cannot at this time determine the question of scienter under *Ernst and Ernst v. Hochfelder*, supra, whether the course of conduct followed by the defendants was intentional deception, reckless disregard of the rights of others or mere negligence. At the present time we do hold that the unseemly haste on December 13 to declare a dividend in kind of Mid-Allegheny Corporation stock held by B&O to stockholders of record that day thus giving the convertible debenture holders no opportunity at all to convert to common stock and considering the prior letters to the plaintiff amounts at least to a prima facie case as the result of inferences in connection with this transaction which enables us to say that there is a likelihood of success upon the merits.

### (2) Irreparable Harm.

The court finds that a showing of irreparable harm has been made if relief is not granted. The actual payment of the dividend and stock of Mid-Allegheny Corporation has been held up pending receipt of clearance from the SEC in the form of either a no action letter or holding that the prospectus is sufficient. If this dividend in Mid-Allegheny Corporation stock is not enjoined the value of which has not been disclosed to the plaintiff, then money damages will not be ascertainable since the real estate resources would readily be transferred to Chessie Resources Inc. and lost in a welter of sales and developments so that it would be well nigh impossible to unscramble these assets and restore them to the holdings of Mid-Allegheny Corporation as to which this dividend in kind would operate or determine value.

The court has also considered whether any prejudice would result from delaying the transaction until we have had a chance to examine the whole matter as to the market value of these properties. The court can see no apparent prejudice to the defendant from a mere delay in a restructure of the company which has long been under consideration. The restructuring would be delayed in going into effect, however it is now held up pending approval from the SEC as noted and the preliminary injunction would only delay the transaction for a further period of time.

We have also considered the harm to other interested persons and can conceive none except to the defendant Chessie System which would not be able to lay its hands on the non rail assets of B&O Railroad Company to the detriment of the convertible debenture holders who would be squeezed out in the transaction. The court is also unable to find that the public interest enters into this matter at all.

For these reasons, the court deems it appropriate that a preliminary injunction should be issued.