**PITTSBURGH TERMINAL CORP.**

v.

**BALTIMORE & OHIO RAILROAD CO.**

**Monroe GUTTMANN et al.,**

v.

**BALTIMORE & OHIO RAILROAD CO.**

Civ. A. Nos. 77–1455, 79–94.

United States District Court,
W. D. Pennsylvania.

March 10, 1981.

---

OPINION

KNOX, District Judge.

## A. INTRODUCTION AND HISTORY OF CASE.

In the Pittsburgh Terminal case at Civil Action No. 77–1455 filed December 28, 1977, the plaintiff of whom Monroe Guttmann, lead plaintiff in Civil Action No. 79–94 was president, filed a complaint against the Baltimore and Ohio Railroad Company alleging that it was a Pennsylvania corporation and that the defendant Baltimore and Ohio Railroad Company (B&O) was a Maryland corporation with its principal offices in Baltimore. The other defendant, Chesapeake and Ohio Railroad Company (C&O) was a Virginia corporation with its principal place of business in Cleveland, Ohio and so was the defendant Chessie System Inc., (Chessie) a Virginia corporation with its principal offices and place of business in Cleveland. The complaint alleged that plaintiff was the owner of certain B&O convertible 4½% debentures Series A due January 1, 2010 in an amount in excess of $50,000.

It was further alleged that as a result of certain purchases by C&O during the period from 1960 to date, 99.63% of the B&O common stock was now owned or controlled by C&O and that no dividends had been paid on B&O common stock since 1961.

It was further alleged that on December 14, 1977, without any notice to plaintiff or other persons similarly situated, the B&O suddenly announced that it had declared a dividend on its common stock on a share per share basis on the stock of Mid-Allegheny Corporation, a wholly-owned subsidiary, payable to shareholders of record on December 13, 1977. The action had been taken on December 13, 1977, without prior notice to anyone including particularly the convertible debentureholders of whom plaintiff was one. He claimed that this was a violation of SEC Rule 10b and Section 10(b) of the Securities and Exchange Act and that there had been a conspiracy to defraud, deceive and mislead plaintiff with regard to its right to convert its debentures. By having B&O declare and pay a dividend

---

Michael P. Malakoff, Pittsburgh, Pa., for plaintiff.

Richard T. Wentley, John Repcheck, T. Lawrence Palmer, Pittsburgh, Pa., Robert J. Block, New York City, Bella Karlowitz, Pittsburgh, Pa., for defendants.

the value of which was undisclosed on December 13, 1977, plaintiff was thereby deprived of the opportunity to make an intelligent decision whether to convert its debentures into common stock and thus receive the dividend. It was claimed that this was also in violation of Article 5, Section 12 of the Trust Indenture of which more hereafter and asked that the defendants be enjoined from having the dividend of Mid-Allegheny Corporation (hereinafter MAC) paid to B&O shareholders without first affording plaintiff adequate information and opportunity to determine whether to convert its debentures into common stock and receive the dividend. The complaint asked that a preliminary injunction be issued thereafter to become permanent, to restrain defendants from paying any dividends in the future without first affording adequate information and opportunity to decide whether to convert.

A hearing was held on the application for preliminary injunction and on March 7, 1978, the court, 446 F.Supp. 656, issued a preliminary injunction restraining defendants from proceeding with the dividend. On March 14, 1978, the defendants appealed to the Court of Appeals for this Circuit. On August 9, 1978, the granted preliminary injunction was reversed by the Third Circuit.

Since the defendants agreed to hold sufficient shares of B&O and MAC stock in their possession to satisfy plaintiffs' claim in the event that it was ultimately determined that plaintiff was entitled to reasonable notice of the dividend and plaintiffs elected to convert, the appeals court held that no injunction was necessary. The granting of a preliminary injunction was reversed with directions to the district court to take "such other steps, if any, as may be required to implement the assurances of defendant's counsel that sufficient shares of B&O and MAC will be available to satisfy any final judgment in plaintiffs' favor, all in accordance with the opinion of this court". A copy of the certified order was issued in lieu of formal mandate on August 9, 1978 and after various arguments, the court, on March 27, 1979, entered an order allowing the defendants to hold sufficient shares pending the ultimate decision of the plaintiff's case and whether it elected to convert.

On February 15, 1979, an amended complaint was filed by Pittsburgh Terminal adding various other allegations to the complaint and in the prayer for relief there was included a prayer for damages (paragraph 4 of the amended complaint) which the circuit had noticed was lacking in the complaint as before it.

The case then proceeded through many tortuous discovery procedures. Plaintiff's motion for partial summary judgment and motion of defendants for summary judgment were briefed and argued and denied by orders of June 24, and June 25, 1980, respectively except the motion was granted to the extent of dismissing the action as to Stephen Muller, Nicholas T. Camicia, and a short time later Cyrus S. Eaton named as directors or former directors of the B&O and the other defendants. These directors were released because they were not directors at the time the action was taken or as in the case of Mr. Eaton it was not denied that he had no knowledge and no participation in the declaration of the dividend in question.

In the Guttmann case filed January 22, 1979, a suit was brought by Monroe Guttmann in his own right, Loretta Guttmann, Janet Rees and Evelyn Bittner. The complaint alleged that Monroe, Loretta and Janet Rees were residents of Pennsylvania and the holders of $723,000 in face value of the 4½% convertible debentures due January 1, 2010, all of which were acquired prior to December 13, 1977, the date of the dividend and that plaintiff Evelyn Bittner was a resident of Pennsylvania holding debentures in the face amount of $10,000 acquired prior to December 13, 1977. The defendants were the same being the B&O, its directors, the C&O and the Chessie System, Inc. The two cases have proceeded together and were tried together.

It should be noted that there is waiting in the wings a third case, namely Lucille Lowry and Lowry Zweig Corp. v. Baltimore and

Ohio Railroad Company, Civil Action No. 79–1504, filed October 22, 1979, over ten months after the dividend in question had been declared. The court has allowed the Lowry case to proceed as a class action but has refused to consolidate it with the Guttmann and Pittsburgh Terminal cases for the reason that on June 16, 1980, the latter were ready for trial and there were distinct factual issues in the Lowry cases which should be heard separately. The court has refused to allow a class action in the Pittsburgh Terminal or Guttmann cases for the reason it appears that the facts were not typical of facts related to other debenture-holders and it appeared that the representation would be inadequate. The motion for class certification was further denied because the motion was made after the cases had been pending for approximately two years in complete violation of Rule 34(c) of this district court requiring that motions to certify class actions be presented to the court within 90 days of filing a complaint in a class action.

In the Guttmann case as in the Pittsburgh Terminal case, motions for summary judgment were filed by the parties and both were denied. The case went to trial non-jury for 4 days, July 21–24, 1980. Thereafter, briefs and arguments were held together with a reargument on one matter which the court felt was inadequately presented and the case is now ready for decision.

## B. FINDINGS OF FACT.

(1) The Baltimore and Ohio Railroad Company is incorporated under the law of Maryland with the principal office in Baltimore, Maryland.

(2) On December 13, 1977, 99.63% of the common stock of the B&O was owned by the C&O.

(3) The C&O is a wholly-owned subsidiary of Chessie.

(4) The Mid-Allegheny Corporation ("MAC") on December 13, 1977, was a wholly-owned subsidiary of the B&O.

(5) Chessie Resources is a wholly-owned subsidiary of Chessie formed for the purpose of developing non-coal mineral real estate and timber lands of Chessie and its subsidiaries.

(6) Plaintiffs were on December 13, 1977 and are holders of certain B&O Convertible 4½% debentures, Series A, maturing January 1, 2010.

(7) The plaintiffs are as follows:

A. Pittsburgh Terminal Corporation is a Pennsylvania Corporation and holds $94,000 in face value of the B&O Convertible 4½% debentures Series A, due January 1, 2010 at issue in this case. The $94,000 in debentures were acquired prior to December 13, 1977.

B. Monroe Guttmann held on December 13, 1977, debentures in the face amount of $446,000 acquired prior to December 13, 1977. Debentures in the face amount of $9,000 acquired prior to December 13, 1977 were subsequently converted into B&O common stock.

C. Loretta Guttmann held on December 13, 1977, debentures in the face amount of $226,000 acquired prior to December 13, 1977. Debentures in the face amount of $2,000 acquired prior to December 13, 1977, were subsequently converted into B&O common stock.

D. Evelyn Bittner held on December 13, 1977, debentures in the face amount of $10,000 acquired prior to December 13, 1977.

E. Janet Rees on December 13, 1977, held debentures in the face amount of $50,000 acquired prior to December 13, 1977.

(8) Chessie was one of the last of the major railroads in America to segregate its non-rail assets from its rail assets.

(9) The Chessie Corporate Restructuring Committee (the "Committee") was officially formed in January, 1977.

(10) The Committee was composed of a number of officers and employees of the B&O, Chessie and its subsidiaries with various areas of expertise including the law.

(11) One of the purposes for the formulation of the Committee was to consider the

transfer of the non-rail assets of the B&O into a corporation not subject to the jurisdiction of the Interstate Commerce Commission so that, inter alia, they would not be subject to the ICC's ban on transportations by a rail carrier of goods manufactured by the carrier or its subsidiaries and the ICC requirement that it must approve all securities issued by a carrier. This requirement renders impossible any joint venture for the purpose of development of real estate by the B&O such as the development of its Georgetown property.

(12) The properties selected for transfer by the Committee were those with potential for development.

(13) In deciding the method of transferring the non-rail properties to a non-rail subsidiary, consideration was given to selling the properties.

(14) The sale method of transfer was rejected because it would have required expensive and time-consuming appraisals (as much as two years for the coal properties alone) and would have required the transfer of substantial amounts of cash and the payment by the B&O of substantial transfer taxes with the risk that the price for the sale would be unfair to the minority shareowners.

(15) The method of transfer of the nonrail properties chosen by the Committee was transferral into a wholly-owned subsidiary of the B&O followed by the declaration of a dividend in its shares to the common shareowners of the B&O.

(16) Whenever any properties were transferred that had rail facilities of any nature, the B&O was granted a permanent easement for the use of those rail facilities.

(17) On December 13, 1977, the B&O declared a dividend in the shares of MAC. This dividend was part of the corporate restructuring program of the entire Chessie System which had begun in 1973 with the formation of Chessie.

(18) The effect of the transfer of the non-rail properties by the dividend route was that the B&O shareholders each retained their same proportionate interests in both the rail properties retained by the B&O and the non-rail properties transferred to MAC.

(19) Prior to the B&O dividend of the MAC stock in December, 1977, the B&O had not paid any dividend since 1961.

(20) The B&O had not paid any dividends during the period from 1961 to 1977 in part because of its weak financial condition and the need to replace a substantial amount of its operating equipment, in part because of substantial bond maturities and in part because of a requirement in the convertible income bond indenture that the B&O pay an amount equal to any dividend into the surplus income sinking fund.

(21) During that same period and even before the C&O had acquired a controlling interest in the B&O, the C&O had provided the B&O with a significant infusion of capital, without which the B&O could not have remained in operation.

(22) Because it was difficult, if not impossible, to value the MAC dividend in terms of fair market value, the decision was made to call the convertible income bonds, since without calling the bonds, it would not have been possible to pay the MAC dividend.

(23) The convertible income bonds were called at a price of $105 per $100 face value during the summer of 1977 at a time when the bonds were being thinly traded at a price of $60 per $100 face value.

(24) At the time of the call of the convertible income bonds, not all of the properties had been selected for transfer by way of the MAC dividend.

(25) The convertible 4½% debentures, Series A, due January 1, 2010, held by plaintiffs and involved in this suit were issued in 1956 on an offer of exchange for outstanding B&O convertible 4½% bonds.

(26) On or about January 1, 1956 the B&O had entered into an indenture with the Chase Manhattan Bank pursuant to which Chase acted as trustee for the debenture issue.

A. Defendants did not file with the Chase Manhattan Bank as Trustees of the Indenture dated 1/1/1956 for the issue of debentures a copy of any published notice concerning the declaration of the MAC dividend on December 13, 1977.

B. Defendants did not advertise notice of the proposed declaration of the dividend in MAC shares on the B&O common stock in a newspaper of general circulation in the Borough of Manhattan, City and State of New York printed in the English language.

(27) Under the terms of the indenture each $1,000 principal amount of debentures could be converted to 10 shares of common stock of B&O. In this respect the indenture provides inter alia:

At the election of the holder thereof, any outstanding debentures of Series A may (subject to the provisions of this Article Five) be converted at their principal amount into shares (fully paid and non-assessable and of the par value of one hundred dollars each) of common stock of the company, at any time up to fifteen days prior to the date of the stated maturity of such debentures, or if such debentures shall be called for redemption, up to fifteen days prior to the date fixed for such redemption at the conversion price of $100 per share.

(28) In March, 1956, the B&O entered into a "listing agreement" with the New York Stock Exchange relating to the listing of these *debentures* with the Exchange. The B&O's listing agreement provided:

The listing agreements set forth in the company's listing application A 12653 and A–15928 are incorporated herein by reference and made a part hereof...

(29) On or about April, 1977, Robert F. Hochwarth and John A. Rogers, head of the Committee, both of whom are attorneys, reviewed the terms of the convertible debenture indenture, with specific reference to Article 5, Section 12, and concluded that the indenture did not require notice to the debentureholders of the declaration of the MAC dividend. Section 12 provides as follows:

"The company covenants and agrees that it will not declare and/or pay any dividend on its common stock payable in stock or create any rights to subscribe for stock or securities convertible into stock unless in any such case notice of the taking of a record date for the determination of the stockholders entitled to receive such dividend, distribution or right is given at least ten days prior thereto by at least one publication in an Authorized Newspaper. A copy of each such published notice shall promptly after such publication be filed with the Trustee."

The terms "Authorized Newspaper" are defined in Article 1, Section 1, ¶ 2 of the Indenture (P Ex 11) to mean:

" 'Authorized Newspaper' means a newspaper of general circulation in the Borough of Manhattan, City and State of New York, printed in the English language and customarily published on each business day, whether or not published on Saturdays, Sundays and holidays."

(30) In arriving at this conclusion, Mr. Hochwarth determined that the word "stock" in section 12 referred only to the stock of the B&O and that the payment of a dividend in kind of the stock of another corporation was similar to a cash dividend. With this, the court agrees.

(31) In addition to Messrs. Hochwarth and Rogers, Doyle Morris and Roland Donnem, also attorneys for the B&O, were likewise consulted about these matters and reached the same conclusions.

(32) Mr. Hochwarth in reaching his conclusion with respect to the absence of need for notice to the debentureholders took into account the fact that under the applicable Maryland law, absent any action by the Board of Directors, the payment date of a dividend was the same as the declaration date.

(33) Mr. Hochwarth also considered the requirements of the New York Stock Exchange with regard to the notice of certain dividends and concluded it was inapplicable because it requires 10 days notice only with regard to a dividend declared on listed stocks and the B&O common stock was not listed.

(34) Listing Agreement A–12653, referred to in the B&O's March, 1956 Listing Agreement, provided under "AGREEMENTS" inter alia:

Section 1, Paragraph 2:

The Corporation will promptly notify the Exchange in the event that it or any company controlled by it shall dispose of any property or of any stock interest in any of its subsidiary or controlled companies, when the disposal thereof will materially affect the financial position of the Corporation or the nature or extent of its operations.

Section III, Paragraph 4:

The Corporation will give the Exchange at least *ten days' notice* in advance of the closing of the transfer books, or of the taking of a record of its stockholders *for any purpose.*

(35) The A–12653 Listing Agreement under "AGREEMENTS" also provided:

Section III, Paragraph 5:

The Corporation will publish promptly to the holders of *any* of its securities listed on the Exchange *any action taken* by the Corporation with respect to dividends or to the allotment of rights to subscribe or to any rights or benefits pertaining to the ownership of its securities · listed on the Exchange; and shall give *prompt* notice to the Exchange of any such action; *and shall afford the holders of its securities listed on the Exchange a proper period within which to record their interests and to exercise their rights. . . .*

(36) The B&O, like all other corporations that have securities listed with the New York Stock Exchange, are bound by the rules of the Exchange as well as their "listing agreements".

(37) Section A–2 of the Exchange Manual entitled "Timely Disclosure", states:

A corporation whose securities are listed on the New York Stock Exchange, Inc., is expected to release to the public any news or information which might reasonably be expected to materially affect the market for those securities. This is one of the most important and fundamental purposes of the listing agreement which each corporation enters into with the Exchange.

(38) Defendants did not provide plaintiffs or the other debentureholders notice of the December 13, 1977, dividend-in-kind of Mid-Allegheny Stock.

(39) The Committee was advised by counsel that making the MAC dividend payable on the same date as the date of declaration did not violate the terms of the indenture under which the convertible debentures were issued.

(40) Mr. Donnem, as Senior Vice President, Law, and General Counsel, has the responsibility to render legal opinions concerning railroad activities to the senior officers and directors of the B&O.

(41) Among those individuals to whom Mr. Donnem conveyed his legal opinion concerning the legality of making the declaration and payment of the MAC dividend on the same date were Robert L. Hintz, Senior Vice President of Finance for Chessie, B&O, and C&O and Hays T. Watkins, Jr., Chairman and President of Chessie System, Inc., Chairman of the Board of the C&O and Vice Chairman of the Board of the B&O.

(42) A *principal reason for making the* payment date of the dividend the same as the date of declaration was to limit the number of shareholders who would receive the MAC dividend in order to avoid the necessity of the preparation and filing of a costly and time-consuming registration statement with the Securities and Exchange Commissions (SEC).

(43) The plan of the B&O to declare and pay a dividend on the same date was made known to outside securities counsel for the B&O, the law firm of Hunton and Williams, in advance of the December 13, 1977, declaration, and they expressed no objection to the proposal.

(44) All of the properties transferred, to MAC were still owned by MAC or its subsidiaries except for those which have been sold and as to those properties, an accounting has been made to MAC for the amount

of the sale price so that the value of the MAC shares remains the same as it was on December 13, 1977.

(45) Following the declaration of the MAC dividend, the value of the remaining assets of the B&O was substantially over one billion dollars.

(46) In formulating the manner in which the MAC dividend was to be declared, the convertible debentures were considered by the B&O as part of its debt structure.

(47) Prior to the institution of these actions, in June and July of 1977, plaintiff Monroe Guttmann ("Guttmann") wrote to his stockbroker and to the B&O expressing his satisfaction with the policy of the B&O of plowing back earnings into the company. He had also asked information with respect to payment of dividends and was rebuffed except that he was told he would be notified if a dividend was declared.

(48) There was no testimony that plaintiffs would have converted their debentures had they received advance notice of the declaration of the MAC dividend. To this day we do not know if Guttmann and the other plaintiffs wish to convert or not.

(49) The B&O has agreed with the trustee under the Indenture that should plaintiffs prevail on the merits of their claims, all debentureholders similarly situated will be accorded similar treatment as required by any judgment for the plaintiffs.

(50) Class action certification was denied April 3, 1980, by this court.

Additional Findings as to B&O Director-defendants.

(51) The directors of the B&O did not intend to defraud plaintiffs.

(52) The conduct of the directors of the B&O did not constitute an extreme departure from the standard of ordinary care.

(53) Roland W. Donnem, Senior Vice President Law and General Counsel, advised the directors of the B&O that the indenture did not require notice to the convertible debenture holders of the declaration of the MAC dividend.

(54) Roland W. Donnem, Senior Vice President Law and General Counsel, advised the directors of the B&O that it was appropriate to have the declaration and payment of dividend on the same day.

(55) The directors of the B&O were informed of the broad purposes of the management's restructuring program and kept advised as to its general progress at several board meetings during 1977.

(56) Milton S. Eisenhower was not present at the meeting of December 13, 1977, nor did he participate in the December 13, 1977, action of the Board of Directors.

(57) None of the directors of the B&O were on the Restructuring Committee.

(58) Article Eight of the Indenture dated January 1, 1956 states:

"Immunity of Officers, Directors and Stockholders.

No recourse under or upon any obligation, covenant or agreement of this Indenture, or of any debenture or coupon, shall be had against any incorporator, stockholder, officer or director, as such, past, present or future, of the Company, or of any successor corporation, either directly or through the Company, by the enforcement of any assessment or by any legal or equitable proceeding or by virtue of any statute or otherwise; it being expressly agreed and understood that this Indenture and the obligations issued hereunder are solely corporate obligations and that no personal liability whatever does or shall attach to, or be incurred by, the incorporators, stockholders, officers or directors, as such, of the Company or of any successor corporation, or any of them, under or by reason of any of the obligations, covenants or agreements contained in this Indenture, or in any of the Debentures or coupons, or implied therefrom; and that any and all personal liability of every name and nature, either at common law or in equity, or by statute, or constitution, of every such incorporator, stockholder, officer or director, as such, is hereby expressly waived as a condition of, and in consideration for the

execution and issue of the Debentures and coupons."

## C. DISCUSSION.

### (1) What Relief Can Be Granted?

The original complaint as filed by Pittsburgh Terminal Corporation asked only that a preliminary injunction be issued to be made permanent on final hearing enjoining the defendants "from having the dividend of Mid-Allegheny Corporation stock paid to B&O shareholders without first affording plaintiff adequate information and opportunity to determine whether to convert its debentures to common stock and also to receive the dividend. It was further asked that the defendants be enjoined from having dividends paid in the future without first affording plaintiff adequate information and opportunity as to whether to convert and for such other and further relief to be granted as may be necessary and proper.

The amended complaint asks that a detailed description of all assets of Mid-Allegheny Corporation as of December 13, 1977, be supplied, that plaintiff be supplied with a detailed appraisal of the assets of Mid-Allegheny and its subsidiaries and the value of Mid-Allegheny Stock at the close of business on December 13, 1977, that an order be entered permitting plaintiff and other debenture holders to retroactively exercise their right to convert into B&O stock "after receiving the data required in paragraphs 1 and 2". Further prayers were for damages, that an injunction issue against paying future dividends without adequate notice and for costs and attorney's fees and other appropriate relief. The complaint in the Guttmann case, 79–94, contains similar prayers for relief. In other words, what Pittsburgh Terminal and Guttmann, its president, originally sought was sufficient information so that they could make an intelligent determination as to whether or not to convert their debentures into common stock of the B&O so as to receive the dividend in kind in stock of Mid-Allegheny Corporation. The circuit in considering the appeal taken from the award of preliminary injunction commented on this aspect of the case and indicated that it would be sufficient for the defendants to retain sufficient shares of B&O and MAC stock to satisfy plaintiff's claim in the event it is ultimately determined that plaintiff was entitled to reasonable notice of the dividend declaration and information to enable it to decide whether to convert. The circuit went on to say: "Given the limited objective of plaintiff's complaint and defendant's commitment through their counsel, we conclude that there was no irreparable harm giving rise to the need for a preliminary injunction." Since the circuit opinion, the plaintiff in Pittsburgh Terminal and the other plaintiffs in the Guttmann case have raised their sights and are now asking for damages, but we still do not know, despite the large amount of discovery which has taken place in this case, whether or not plaintiffs want to convert their debentures into common stock or not. As was originally foreseen, it was expected it would only take a short period of time for the defendants to gather together information with respect to the values of the assets of the Mid-Allegheny Corporation and, of course, its liabilities to determine at least the book value of MAC stock.

What plaintiffs were complaining about was that they could not make informed decisions and after all this discovery it appears they still do not have the information upon which to make an informed decision as to whether to convert or not. The holdings of Mid-Allegheny Corporation and its subsidiaries are very large as appears from the facts in this case. We have no information as to the value of these assets which could form the basis for any decree. There is nothing to base an award on and without these figures we have no method of determining what damages, if any, have been sustained by the plaintiffs. It is true that the plaintiff has proved general type of damages. *Rochez Brothers v. Rhoades*, 527 F.2d 891 (3d Cir. 1975). Plaintiffs are asking for a detailed description of the assets of Mid-Allegheny Corporation, which apparently we have as a result of discovery, but plaintiffs also go on and demand an ap-

praisal of these assets by the B&O to determine whether or not they should convert. Testimony indicated that there have been no recent appraisals.

We are confronted with vast acreages of property including timber and coal mining properties in several states, and also urban and water front real estate in certain large cities which many railroads acquire over the years. Some of these may be very valuable in the future but to determine the value of them now is going to be exceedingly difficult. The B&O claims that it will take approximately ten years to have an appraisal of the assets of Mid-Allegheny and would cost many millions of dollars. It is doubtful whether the court has the right to order the B&O to make such appraisal and to proceed to expend the money therefor. If this is true, plaintiff will still not have sufficient information to intelligently determine whether or not to convert his stock. In other words, in considering this case, we must also consider the possibility that the suit will be futile.

On the other hand, we could hold that plaintiffs, having been informed as to the items of property held by MAC, can be given the opportunity to make the appraisal themselves. They are entitled, of course, to such data as the B&O has in its possession as to value but the values are so speculative that it is impossible for the court to make an award based upon them. The court felt it was important to make these observations before proceeding with the plaintiffs' right to recover on the merits since even if they do recover on the merits on the question of liability, it is questionable what further we can do for them at least until they make their own decision and tell us whether they wish to convert or not.

(2) The Purchaser or Seller Controversy.

The defendants claim that the plaintiff in this case, a holder of convertible debentures who has not converted or attempted to convert them into stock, has no standing as a purchaser or seller under the Federal securities laws. Such finding is necessary in order to give effect to Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j)[1] and violation of Rule 10b–5[2] of the Commission issued thereunder. The court held at the time of its memorandum opinion on the issuance of a preliminary injunction that plaintiffs were holders of convertible debentures which had not converted but that nevertheless the plaintiffs were sellers or purchasers for the purpose of bringing suit in this case under the decision of the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In *Blue Chip,* the court held: "*Blue Chips,* supra, involved the offerees of a stock offering made pursuant to an antitrust consent decree. The offerees had neither purchased nor sold any of the offered shares and the court determined that the rule had been clearly stated in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir. 1952) that a suit under 10b–5 cannot be brought without the plaintiff having bought or sold *or having contractual rights for purchase or sale of securities.*" The Supreme Court specifically said, however, at page 421 U.S. 751, 95 S.Ct. at page 1932:

---

1. 15 U.S.C. § 78j provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility on any national securities exchange—* * * (b) To use or employ, in connection with the *purchase or sale of any security* registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. Rule 10b–5 provides: "It shall be unlawful for any person, directly or indirectly by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, *in connection with the purchase or sale of any security.*"

"Unlike respondent, which had no contractual right or duty to purchase Blue Chip's securities, the holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as 'purchasers' or 'sellers' of securities for purposes of Rule 10b–5, not because of a judicial conclusion that they were similarly situated to 'purchasers' or 'sellers', but because the definitional provisions of the 1934 Act themselves grant them such a status."

It would seem that this would be sufficient since the convertible debentures constitute a contract permitting the holder of the same to convert into common stock of the B&O and thus there is a contract right to acquire B&O stock which should be held as a contract of purchase or sale under 10b–5.

The defendants relied strongly upon Broad v. Rockwell International Corp., (N.D.Tex.1977 Federal Securities Law Reporter, ¶96193), which has since been affirmed in this respect by the Court of Appeals for the Fifth Circuit at 614 F.2d 418 (March 24, 1980).

When this matter was first presented in this case, I specifically declined to follow Broad v. Rockwell and held that the best exposition in this area relative to rights of convertible debenture holders was contained in the decision of Judge Tenney of the Southern District of New York in *Green v. Hamilton International Corp.*, 437 F.Supp. 723 (1977).

In the companion case of *Lowry and Lowry Zweig Corp. v. B&O*, W.D.Pa. No. 79–1504 in memorandum opinion dated June 17, 1980, this court again refused to follow Broad v. Rockwell which had been affirmed by the Fifth Circuit on March 24, 1980. At that time we said:

"We have examined Broad v. Rockwell International Corporation, supra, with care and note that it was a merger case wherein in the merger agreement the debenture holders still retained the right to convert into cash but were denied the right to convert into stock and it was held that they had no standing under Blue Chips."

The court admitted that it had not been willing to extend the definition of purchaser or seller to the extent the Second and Third Circuits had citing, inter alia, *In re Penn Central Securities*, 494 F.2d 528 (3d Cir. 1974). As a result the defendant's motion for summary judgment in Lowry was denied and the same is true as to the motions for summary judgment filed by the defendant itself and by the directors.

■ In view of the fact that we have recently reviewed this whole matter and remain unconvinced that the contract to obtain common stock in exchange for a convertible debenture is not a contract for purchase or sale within the meaning of 10b–5 we again hold that the plaintiffs do have standing as purchasers and/or sellers to bring this suit.

(3) Scienter.

The requirement that scienter must be shown by the plaintiff is most clearly enunciated by the Supreme Court in the case of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 47 L.Ed.2d 668, 96 S.Ct. 1375 (1976). In this case, the court clearly held that Section 10(b) of the Act "was addressed to practices that involved some element of scienter and could not be read to impose liability for negligent conduct alone". Referring back to Footnote 12 the court held:

"In this opinion the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under Section 10(b) and Rule 10b–5."

The court thus held that scienter, which is required for recovery under 10b–5, refers to intent to deceive, manipulate or defraud and the question of liability for recklessness was left open. The matter again appeared in the decision in *Santa Fe Industries, Inc.*

*v. Green,* 430 U.S. 462, 51 L.Ed.2d 480, 97 S.Ct. 1292 (1977) where the court pointed out that the act itself makes it unlawful for a person to use or employ any manipulative or deceptive device or contrivance in contravention of the commission's rules and that it is required that there be an artifice to defraud which operates or would operate as a fraud or deceit.

While the question of liability for recklessness as opposed to intentional deception or misrepresentation was not answered in *Ernst & Ernst,* the matter soon came before our circuit in *Coleco Industries, Inc. v. Berman,* 567 F.2d 569 (3d Cir. 1977) wherein the Court of Appeals for our circuit held that a plaintiff suing under Section 10(b) and Rule 10b–5 must prove injury resulting from a conscious deception or from a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception. The court refused to further refine the bounds of recklessness but held that there was insufficient evidence in the case before it.

The court further went on to define recklessness in *McLean v. Alexander,* 599 F.2d 1190 (3d Cir. 1979) wherein it held that the burden of proof of scienter was upon the plaintiff and approved the language that scienter requires "a conscious deception or a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception." The court further approved a quotation from the Seventh Circuit in *Sunstand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir. 1977) that "reckless conduct may be defined as highly unreasonable conduct involving not merely simple or even inexcusable negligence but an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

Approaching the question in this case from the point of view of the standards thus laid down we do find that the defend-

ants relied upon the advice of their attorneys and also upon the advice of outside counsel, a distinguished firm in the securities field in Richmond, Virginia. It does not appear that any of these attorneys had any apparent conflicting interest although, since all but the Richmond firm held the position of house counsel, we must subject their opinions to close scrutiny. At this point we note the case of *Drachman v. Harvey,* 453 F.2d 722 (2d Cir. 1972) wherein the Second Circuit pointed out that in a situation such as we have here between convertible debentureholders and common stock holders there are conflicting rights and the Board of Directors must give due consideration to the conflicting rights of both parties.

█ In short, in order to succeed here, we must find that plaintiffs have carried their burden of showing a plan to deceive and deny rights to the convertible debenture holders bearing in mind that the payment of dividends is ordinarily in the discretion of the Board of Directors unless engaged in some illegal enterprise.

In the case at bar, we find no design to depress the stock of B&O despite inferences which the plaintiffs say should be drawn from the evidence in this case. There was a statement in the record that the officers of B&O had stated in 1975 that they would never declare a dividend in common stock of B&O but it must be recognized that this at most would be regarded as a loose statement subject to change by events at any time. We also find that there was a legitimate business purpose in this case. The corporation planned to remove the non-rail assets of B&O from supervision of the Interstate Commerce Commission with respect to financing and also to spin off the non-rail assets so that they could be managed by someone skilled in development of other types of real estate and not hamper the operation of the railroad with plans for unrelated property and the taxes which must be paid thereon and other expenses in connection therewith.

█ In the preliminary injunction opinion in this case, we stated we could not then

determine the question of whether there was intentional fraud or recklessness or mere negligence. Also in plaintiffs' motion for partial summary judgment we said that we could not determine scienter on such a motion since it involved a question of fact as to purpose and intent and also the defense of good faith might be operable. We further indicated that there might be legitimate purposes shown to segregate the non-rail assets from the rail assets. Another business reason for the spin off of the non-rail assets was the fact that ICC restrictions prevented the possibility of forming joint ventures (Tr. 265, 397). We thus find that a legitimate business purpose was being followed in declaring this dividend in kind and removing the non-rail assets from the ownership and control of the B&O. See *SEC v. Texas Gulf Sulphur*, 461 F.2d 833 (2d Cir. 1968). Before all the circumstances had developed, the court indicated at the preliminary injunction that from the showing made there was a likelihood of success on the merits. This was before we had held a full hearing on the merits and all the testimony as to the background and purposes of management was before us. We now hold that there is no evidence of misleading or deception or misrepresentations or use of manipulative devices which would furnish a cause of action under 10b–5. There has been no showing of manipulation by insiders here or trading in shares or offers to trade based upon insiders' information.

We should point out that we do agree with the Fifth Circuit in *Broad v. Rockwell International*, 614 F.2d 418 (5th Cir. 1980), wherein it was held that reckless conduct describes an extreme departure from standards of ordinary care which presents a danger of misleading buyers or sellers as either known to defendant or is so obvious that defendant must have been aware of it. They held, however, in that case where the

rights of convertible debenture holders to participate in a merger were shut off that there was insufficient evidence of scienter to justify recovery.

We will therefore hold for the defendants with respect to the question of scienter. We find that the defendants were engaged in a legitimate business purpose with respect to corporate planning and no intention has been shown by the plaintiffs of intent to defraud them or failure to investigate the procedures before they were adopted. It should be remembered always that there was still a small number of minority shareholders of B&O Railroad Company and they were not deprived of any rights of dividends in kind in Mid-Allegheny Corporation.

(4) Claims Under Stock Exchange Provisions and Listing Agreements.

In the complaint as originally filed in this case, claim was made under the rules of the New York Stock Exchange and the listing agreement between B&O Railroad Company and the Exchange and also for violation of Section 6 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78f. While over two years passed nothing much was made of this cause of action until it appeared in a motion by plaintiff for partial summary judgment.

The court denied plaintiff's motion for partial summary judgment based on this claim in the memorandum dated June 24, 1980. In that memorandum, we indicated that we would listen to evidence with respect to this claim; that it appeared in previous cases that actions had been recognized where suits were involved against brokerage houses and the New York Stock Exchange itself. No case had been cited where a security holder could bring suit against his own company for such a cause of action.[3]

---

**3.** "There is a further claim by plaintiffs for summary judgment that the failure to give notice of the intended declaration of dividend in Mid-Allegheny stock was in violation of the listing agreement claim under the New York Stock Exchange Act and in violation of Section

78f of the Securities Act Amendments which became effective in 1975.

"This matter has never been brought up before in the meetings or arguments in this case. Whether it can be used as a fresh basis for a cause of action or not, we do not determine at this time but will listen to the evidence with

■ We have now received not only the evidence necessary to decide this claim but also, not being satisfied with the argument and brief the first time around, we directed a reargument to be held and the parties have reargued this matter and submitted supplemental briefs and other materials. We conclude that no cause of action on the basis of the exchange rules or the listing agreement can be sustained.

■ 15 U.S.C. § 78f (Section 6 of Securities and Exchange Act of 1934) provides for regulation of the relations between the SEC, stock exchanges and their members. It provides that the exchange must be able to "enforce compliance by its members and persons associated with its members, with the provisions of this chapter, the rules and regulations thereunder, and the rules of the exchange." [4]

It is noted that section 6 does not explicitly grant a private cause of action to persons such as plaintiffs who are security holders of corporations whose securities are listed on the exchange. Such a cause of action, if it exists at all, must be implied under *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). As many times stated by the court, the question is whether a private cause of action is created expressly or by implication and what must ultimately be determined is whether congress intended to create the private remedy asserted. *Transamerica Mortgage Advisers v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 60 L.Ed.2d 82 (1979). It must be admitted as argued by the defendants that in recent years the court has shown a tendency away from a private cause of action where congress, well knowing how to create one, did not do so in so

many words. See *Collins v. Signetics Corp.*, 605 F.2d 110 (3d Cir. 1979) where our own circuit held that we must respect recent Supreme Court teachings that militate against excessively expansive readings. In *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139 (3d Cir. 1973), our circuit cautioned against expansive reading implying private causes of action. In *Jablon v. Dean Whitter & Co.*, 614 F.2d 677 (9th Cir. 1980), .t was held there was no private cause of action to be implied under Section 6 and this has been the holding of our companions in the Eastern District. See *Lenowitz v. Philadelphia Stock Exchange*, 502 F.Supp. 428 (1980); *Hoover v. E. F. Hutton & Co., Inc.*, (E.D.Pa. June 24, 1980, No. 79–3475) and *Rankl v. Elkins Stroud Supplee and Co.*, (E.D.Pa. June 12, 1980, No. 79–3187).

We therefore hold that the purpose of Section 6 was to regulate the stock exchanges themselves and dealings between them and their broker-members and there is no implied private cause of action under this section.

(5) Private Cause of Action Based Upon Listing Agreement.

The listing agreement covering B&O Convertible 4½ Debentures Series A due January 1, 2010, is dated March 22, 1956 and bears the stock exchange No. of A–16166. The debentures as described on page 3 thereof under the heading "Indenture Provisions" provide that they shall be converted at the principal amount thereof into shares of the par value of $100 each in common stock of the company at any time up to 15 days prior to stated maturity or date of redemption at the conversion price of $100 per share. It is provided on page 2 that "the listing agreements set forth in the company's listing applications A–12653 and

respect thereto. It is noted that a private right of action has been recognized by certain courts. See *Hughes v. Dempsey Tegler & Co., Inc.*, 534 F.2d 156 (9th Cir. 1976). See also *Lang v. NY Stock Exchange*, 548 F.2d 61 (2d Cir. 1977). In other words the suits in which such rights of action have been recognized are those involving suits against brokerage houses of the New York Stock Exchange itself. The defendants have countered with the allegation that to disclose such material in advance of the director's

meeting would require disclosure in violation of other sections of the securities laws.

"In view of the interplay with the various rules, we think and the court is of the opinion it must receive complete evidence on this point."

4. The other subsections of 78f(b) provide in general for regulation of the relationship between the exchange and its members and the discipline of the latter.

A–15928 are incorporated herein by reference and made a part hereof."

Referring back to A–12653 dated February 18, 1947, covering certain issues of first mortgage bonds, refunding mortgage bonds and convertible income bonds due February 1, 2010, on pages 11 and 12 are two causes which have caused the court some trouble. Paragraph 5 on page 11 reads as follows:

"5. The Corporation will not make, nor will it permit any subsidiary directly or indirectly controlled by it to make, any substantial charges against capital surplus, without notifying the Exchange. If so requested by the Exchange, the corporation will submit such charges to stockholders for approval or ratification."

Paragraphs 4 and 5 on page 12 provide as follows:

"4. The Corporation will give the Exchange at least ten days' notice in advance of the closing of the transfer books, or of the taking of a record of its stockholders for any purpose.

"5. The Corporation will publish promptly to the holders of any of its securities listed on the Exchange any action taken by the Corporation with respect to dividends or to the allotment of rights to subscribe or to any rights or benefits pertaining to the ownership of its securities listed on the Exchange; and shall give prompt notice to the Exchange of any such action; and shall afford the holders of its securities listed on the Exchange a proper period within which to record their interests and to exercise their rights; and shall issue all such rights in form approved by the Exchange and will make the same transferable, payable and deliverable in the Borough of Manhattan, in the City of New York."

The court does hold that II(5) on page 11 and III(4) and (5) on page 12 have to do with bookkeeping and operating procedures between the stock exchange and the company and do not confer any private rights of action upon the stockholders. See *Hughes*

*v. Dempsey Tegler and Co.*, 534 F.2d 156 (9th Cir. 1976); *Lank v. New York Stock Exchange*, 548 F.2d 61 (2d Cir. 1977).

We find no precedent where any court has ever held against a stock exchange based upon a third party beneficiary theory as proposed by the defendants here.

Supplementing the listing agreement is the stock exchange manual which clearly shows that the listing agreements are for setting forth the relations between the companies and the stock exchange and not to give rise to third party causes of action by a security holder against his own company.

As pointed out by the defendants, the third party beneficiary doctrine to apply in any situation must demonstrate (1) that there is a legally enforceable contract, (2) that it was breached and (3) that plaintiff was intended by the makers of the contract to benefit by it. We hold that this contract was to regulate relations between the company and the stock exchange inter se, that there was no intent to create a third party cause of action in the security holders and, in any event, in this particular case, if notice had been given, it would not have helped the plaintiffs in any respect because they would not have been able to make an intelligent determination as to whether to convert or not to convert within 10 days or whatever time might have been allotted since they have not been able to make that determination within the 3 years this case has been pending. The reason this cannot be done is inherent in the fact that no intelligent evaluation of the stock of Mid-Allegheny Corporation can be made even at this time or, if one is to be made, it will take years and cost millions of dollars to do it. In many respects these paragraphs of the listing agreement are vague in that they do not make it clear whether the exchange must be notified before an action is taken or it can be notified in a reasonable time thereafter. See also Restatement of Contracts Section 133.[5] We agree that

---

5. § 133. Definition of Donee Beneficiary, Creditor Beneficiary, Incidental Beneficiary.

(1) Where performance of a promise in a contract will benefit a person other than the

there is no evidence of any intent to make a gift from the New York Exchange, the promisee in this agreement to the plaintiffs nor are they creditor beneficiaries under the second paragraph of the Restatement. See *MacKubin v. Curtiss-Wright Corp.*, 190 Md. 52, 57 A.2d 318 (D.Md.1948) holding that a security holder suing for violation of a listing agreement as a third party beneficiary is neither a donee beneficiary nor a creditor beneficiary. He is at most an incidental beneficiary with no right of action under Restatement 147 [6] against either the promisee or the promisor. The listing agreement itself makes no reference to any action by a security holder as third party beneficiary thereunder and nothing is said concerning a third party beneficiary claim under this listing agreement. It should be further pointed out that the stock exchange itself provides for its own regulation and for penalties against companies which violate their rules and regulations.

We therefore hold that there is no liability under the listing agreement and the same is doubly true with respect to liability on the part of the directors. See *A. B. Corporation v. Futrovsky*, 259 Md. 65, 267 A.2d 130 (1970).

It should be noted that ten years after the listing agreement covering the convertible debentures here involved the company suspended trading in its common stock. This is not considered of importance because the listing agreement covering the convertible debentures is still in effect. We therefore hold for the defendants on the matters of the listing agreement and the New York Stock Exchange Rules under Section 6 of the Securities and Exchange Act.

## D. CONCLUSIONS OF LAW.

(1) Plaintiffs do have standing to sue under Section 10(b) and Rule 10b–5 because they had a contract to purchase and sell.

(2) Plaintiffs have failed to establish that the corporate defendants had the requisite scienter to establish a violation of Section 10(b) and 10b–5.

(3) The shareowners of the B&O elect its Board of Directors and that Board has the right and obligation to determine whether the assets of the company remain invested with the company or are distributed back to its shareowners. (Tr. 600)

(4) The B&O's declaration of a dividend payable to shareholders of record on the same date as the date of declaration was in accord with the applicable Maryland law.

(5) The B&O's declaration of a dividend payable to shareholders of record on the same date as the date of declaration was in accord with the terms of the Indenture under which the B&O convertible debentures were issued.

(6) The Indenture does not require that any notice be given debentureholders of a dividend payable in the stock of a company other than the B&O because such a dividend is the equivalent of a cash dividend although payable in kind.

promisee, that person is, except as stated in Subsection (3):

(a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary;

(b) a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary, or a right of the beneficiary against the promisee which has been barred by the Statute of Limitations or by a discharge in bankruptcy, or which is unenforceable because of the Statute of Frauds;

(c) an incidental beneficiary if neither the facts stated in Clause (a) nor those stated in Clause (b) exist.

**6.** § 147. Effect of a Promise of Incidental Benefit.

An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee.

(7) Plaintiffs have failed to prove that they have a right to proceed on an implied cause of action for any breach of any listing agreement with the New York Stock Exchange or the Rules of said Exchange.

(8) Plaintiffs have failed to prove that they were damaged in any way by the declaration of the MAC dividend.

(9) Convertible debentureholders are general creditors of a corporation and have no call on any particular assets of the corporation.

(10) Plaintiffs have failed to prove that they would have converted their debentures had they received advance notice of the declaration of the MAC dividend.

(11) Plaintiffs failed to establish that the defendant directors had the requisite scienter to establish a violation of Section 10(b) and Rule 10b-5.

(12) The defendant directors are relieved of any contractual liability to plaintiffs by virtue of Article Eight of the Indenture.

(13) Plaintiffs failed to establish that director Milton S. Eisenhower, who did not attend or participate in the December 13, 1977, meeting of The B&O Board of Directors, had the requisite scienter to establish a violation of Section 10(b) and Rule 10b-5.