A. B. CORPORATION ET AL. *v.* FUTROVSKY ET AL.

[No. 427, September Term, 1969.]

*Decided July 10, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Leo Wm. Dunn, Jr.,* with whom were *Nylen & Gilmore* cn the brief, for appellants.

*Paul H. Mannes,* with whom was *Stanley Klavan* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

We are here concerned with the effect of the breach of a specific warranty in a contract for sale of real estate. The trial judge entered judgment against appellants, A. B. Corporation (the seller) and Messrs. Brown, Schoolfield and Harris, all of whom were directors of the seller, in the amount of $21,901.44. Mr. Brown was the

president and sole stockholder. Plaintiffs were the appellees, Charles J. Futrovsky, Charles Santos and Angelo Santos, certified public accountants (the buyers). We shall affirm the judgment against the corporation and reverse the judgment against the individuals.

The points here raised are (1) that the damages awarded by the court were not within the contemplation of the parties at the time the contract was executed and were speculative, (2) there was a variance between the allegations of the declaration and the proof presented, and (3) it was error to hold the officers and directors of A. B. Corporation liable.

In the summer of 1964 the seller owned a tract of land in Prince George's County improved by 27 or 28 apartments. (Statements as to both numbers appear.) One of the buyers discussed with a realtor the possibility of purchasing a property that would show "ten per cent syndication cash flow." The buyers ultimately inspected the property of the seller. It had been completed and "rented in full almost through July of that same year, '64." The seller was asked for and delivered to the realtor books of the corporation. With the books was a notice of assessment and the tax bills that had been received by the seller. A cash flow statement was prepared by the realtor and delivered with the books to the buyers. The "asking price" for the property was given as both $315,000.00 and $325,000.00. The buyers instructed the realtor to prepare a contract for $295,000.00, with cash to be paid for the sum in excess of the existing first lien. One of the buyers testified that this offer was based on the cash flow. In the cash flow statement as originally prepared the figure "$4,500.00" appeared relative to taxes. Someone struck through this figure and inserted "$3,000.00". The buyers claimed they were unable to find in the books any payment for taxes other than "[a] very nominal figure * * * for personal property tax." The realtor was advised that before the buyers would sign a contract they would want the seller to warrant that the taxes were under $2,900.00. Ultimately, a counteroffer for a purchase

at $305,000.00 was agreed to, including a "Second Trust note" in the amount of $10,000.00 and assumption of the existing first lien. Written into the contract was:

> "Seller warrants that real estate taxes have been assessed and levied on the completed project and that these taxes do not exceed $2,900. per annum."

The contract by its terms provided also:

> "* * * [T]he provisions hereof shall survive the execution and delivery of the deed * * * and shall not be merged therein * * *."

Mr. Brown testified that after the counteroffer was made the question of taxes arose and he was asked if he "would make a statement to the fact the taxes did not exceed $2,900". He said that he computed state, county and city of Laurel taxes on the basis of the assessment form and believed that the figure was "about $2,880" and used $2,900.00 as a round figure. He was willing to warrant the $2,900.00 figure.

Settlement was duly made. At settlement on February 23, 1965, taxes were adjusted on the basis of $1,923.99 state and county taxes and $744.53 city of Laurel taxes.

In September of 1965 the buyers were notified by "the mortgage company that [they] had a shortage in [their] escrow account in the amount of $500 and some odd dollars." They then received a bill from the county with an explanation saying there had been an additional assessment made in March of 1965.

It ultimately developed that the assessor assessed only 15 of the apartments from July 1, 1964. On February 1, 1965, he inspected the premises and on March 5, 1965, (after settlement) sent out a notice indicating an assessment on the remaining 12 apartments dated from January 1, 1965.

The buyers sued the seller, the individual defendants and realtor. There were two counts in the declaration. The first count recited the contract, which was attached;

the warranty in it; the negotiations; the fact that the tax assessment had only been made on 15 of the 28 units; that the final tax bill was in excess of $5,000; that "[t]he contract and [cash flow] statement provided $2,900 for real estate taxes and showed a net return on the capital investment of approximately 10 to 12%"; that "[b]oth the contract and the statement contain[ed] material representations, as [previously] stated * * * which induced [buyers] and upon which [buyers] relied in purchasing the property"; that the seller was the owner and the individual defendants were officers of the corporation and acted on behalf of the corporation in the sale of the property; that they knew or should have known that the warranty in the contract was a misrepresentation of a material fact; and that they knew or should have known "that the statement presented by the real estate agent showing the operating cost of the townhouses, which included $2,900 for real estate assessments, was a misrepresentation of a material fact", with the concluding paragraphs:

"That because of the increase in the real estate assessment, when finally made on the completed project as described, there is no net return on the property and the resale value of the property has been greatly decreased.

"That thereby the defendants deceived and defrauded the plaintiffs.

"WHEREFORE, the plaintiffs demand judgment against the defendants, jointly and severally in the amount of $80,000.00 in compensatory and exemplary damages, plus the costs of this suit."

The second count of the declaration incorporated the allegations of the first count by reference. It then said:

"That the aforesaid warranty made by the Seller as follows: 'Seller warrants that real estate taxes have been assessed and levied on the

completed project and that these taxes do not exceed $2,900 per annum' was breached by the defendants as aforesaid.",

and demanded judgment "against the defendants jointly and severally in the amount of $30,000.00".

The trial judge entered judgment in favor of the realtor, from which there has been no appeal.

In the trial of the case the buyers abandoned the first count and relied on the second count, the breach of warranty issue. An expert witness was presented by the sellers who valued the property by the income approach. His was the only testimony relative to value. He capitalized net income allocable to improvements at 9%. By this method he determined the value of the property with taxes at $5,010.00 per annum as $247,260.00 and the value with taxes of $2,900.00 per annum as $270,704.44. The difference of $23,444.44 he rounded off at $23,500.00. A part of the increase of taxes to $5,010.00 was attributable to an increase in the tax rate. By the expert's calculation this produced an adjusted difference in value attributable to the breach of warranty of $21,901.44, which was the amount of judgment entered against the seller.

## I.

It is undisputed that there is here a breach of warranty. The seller urges that the damages awarded by the court were not within the contemplation of the parties at the time the contract was executed and proceeds to point out some fly specks in the hypotheses upon which the expert rested his conclusions. The fact remains, however, that there was no objection to the testimony of the expert, there was no motion to strike the testimony of the expert and the final figure at which he arrived is less than a capitalization of 10-12% on the tax differential, the basis upon which the buyers said in their declaration they were buying.

In *Casualty Ins. Co. v. Messenger*, 181 Md. 295, 29 A. 2d 653 (1943), Judge Delaplaine said for the Court:

"The rule for the measure of damages for breach of contract, as laid down in England by Baron Alderson in the leading case of *Hadley v. Baxendale,* 9 Exch. 341, 5 Eng. Rul. Cas. 502, 504, has been adopted in the State of Maryland as well as generally by the [courts] of the United States. The rule is that the amount of damages recoverable for breach of contract is such as may reasonably be considered as arising naturally from the breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the [probable] result of the breach of it. *Winslow Elevator & Machine Co. v. Hoffman,* 107 Md. 621, 635, 69 A. 394, 396, 17 *L. R. A., N.S.,* 1130; *Primrose v. Western Union Telegraph Co.,* 154 U. S. 1, 14 S. Ct. 1098, 1106, 38 *L. Ed.* 883, 894, 15 *Am. Jur., Damages,* Sec. 52." *Id.* at 300-301.

See also 22 Am.Jur.2d *Damages,* § 56 (1965) ; *Correlli v. National,* 240 Md. 627, 214 A. 2d 919 (1965) ; *M & R Builders v. Michael,* 215 Md. 340, 346, 138 A. 2d 350 (1958) ; and *Abbott v. Gatch,* 13 Md. 314 (1859).

The *Hadley v. Baxendale* rule to which Judge Delaplaine alluded was set forth by our predecessors in *U. S. Telegraph Co. v. Gildersleve,* 29 Md. 232 (1868), where Judge (later Chief Judge) Alvey said for the Court:

"Lastly, as to the measure of damages, if there be a breach of the contract. This is a subject about which there has been a considerable diversity of opinion, and great want of precision in the attempts to define rules of general application. But, by the latest and best considered cases upon the subject, the rule seems to be now pretty well established, that a party can only be held responsible for such consequences as may be reasonably supposed to have been in the contemplation of both parties at the time of

making the contract, and that no consequence, which is not the necessary or ordinary result of a breach, can be supposed to have been so contemplated, unless full information be imparted to the party sought to be held liable at the time of entering into the engagement. This is the rule furnished by the case of *Hadley v. Baxendale*, 9 Exch. 341, 354, and which has been recognized and approved in *Fletcher v. Tayleaur*, 33 Eng. L. & E. 187-191, and other cases, as being in all respects the most correct and precise. The case of *Hadley v. Baxendale* was this: The plaintiffs, owners of a steam mill, broke a shaft, and desiring to have another made, they left the broken shaft with the defendant, a carrier, to take to an engineer to serve as a model for a new one. At the time of making the contract, the defendant's clerk was informed that the mill was stopped, and that the plaintiffs desired the broken shaft to be sent immediately. Its delivery was delayed, however, and the new shaft kept back in consequence. The plaintiffs brought their action for a breach of this contract with the carrier, and they claimed, as special damages, the loss of profits while the mill was kept idle. But because it was not made to appear that the defendant was informed that the want of the shaft was the only thing that was keeping the mill from operating, it was held that he could not be made responsible to the extent claimed. And the court, in delivering its judgment, said: 'We think the proper rule in such a case as the present, is this—where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be, either such as may fairly and substantially be considered as arising naturally, *i.e.*, according to the usual course of things, from such breach

of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made, were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of a contract under these special circumstances so known and communicated.

" 'But on the other hand, if those special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases, not affected by any special circumstances for such a breach of contract. For, had the special circumstances been known, the parties might have expressly provided for the breach of contract by special terms as to the damages in that case, and of this advantage it would be very unjust to deprive them.' " *Id.* at 249-50.

The seller relies on *Winslow Elevator Co. v. Hoffman,* 107 Md. 621, 69 A. 394 (1908). There in applying the *Hadley v. Baxendale* rule and denying liability of an elevator owner to a building owner for breach of warranty, the Court said:

"Nor is it contended that the loss of rents claimed can be recovered under the first part of the rule in *Hadley v. Baxendale,* because obviously such losses are not the direct and natural result of the breach alleged. They are special, or consequential damages for which recovery is sought under the second part of that rule which

is expressly relied upon by the appellees. In the statement of this rule it will be observed that general language is used, and it has been found that its application to the facts of particular cases has given rise to questions of great nicety and difficulty. While the rule has been universally recognized, the instances of its application present some confusion. It is true that in this case the appellant knew at the time he made the contract that the elevator was to be installed in an office building; but it would seem to be clear, both upon reason and authority, that *mere knowledge* of that fact would not be sufficient to render it liable for the special losses claimed in this suit. To fix such a liability upon it upon that ground alone, and in this case there is no other upon which it can rest, would be a startling and dangerous proposition. Under such a rule the plumber, the gas fitter, the stair builder, or the machinist who defaulted in his contract to do certain work upon any of the great office buildings might be held liable for enormous special damages simply because he knew his contract had reference to such a building. Certainly no support can be found in *Hadley v. Baxendale,* for such a position, and we have discovered none elsewhere.

"Where a recovery is asked under the second part of the rule stated in that case, which constitutes an exception to the general rule upon the measure of damages, the evidence must show that the 'special circumstances, being in view of both parties to the contract, constituted its basis.' The rule is never applied unless the evidence warrants the conclusion that the contract was, to some extent, based upon the special circumstances out of which the injury arose. To apply this rule the evidence must show that 'the knowledge must be brought home to the party

sought to be charged under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition.' *British Columbia Saw Mill Company v. Nettleship*, L. R. 3 C. P. 509." *Id.* at 637-38.

The question of whether the damages were within the contemplation of the parties is a mixed question of law and fact. In 22 Am.Jur.2d *Damages*, § 57 (1965), it is said:

"The requirement that contract damages be in the contemplation of the parties, or be foreseeable, at the time the contract is entered into, is a rule of law; it is not an element of the actual intent needed for the formation of the contract. Thus, it is not necessary that the parties ever have considered the question of damages for the defaulting party to be liable for those damages which, in the normal course of events, would reasonably be expected to flow from a breach of the contract terms."

The realtor admittedly was the agent of the seller. As Judge Sybert said for the Court in *Durst v. Durst*, 225 Md. 175, 169 A. 2d 755 (1961):

"It is axiomatic that knowledge acquired by an agent in the course of his agency is imputed to his principal. *Boring v. Jungers*, 222 Md. 458, 160 A. 2d 780 (1960), and cases there cited." *Id.* at 180.

The agent knew full well the basis upon which the buyers were purchasing. Without reference to that, however, one could reason as did the trial judge who said:

"Requesting this express warranty as part of the contract reasonably put A. B. Corporation * * * on notice that plaintiffs were relying on the representations made as to their purchase.

\* \* \* The express warranty in the present case clearly demonstrated the special condition upon which the contract was accepted."

It thus will be seen that *Winslow, supra,* is of no comfort to the seller.

It should have been obvious to the seller that there was a reason for the request by the buyers of a warranty as to the taxes. The only purpose of such a warranty would be for the bearing it might have on the value of the property insofar as the buyer was concerned. Bearing in mind that in *Bergeman v. State Roads Comm.,* 218 Md. 137, 146 A. 2d 48 (1958), this Court recognized "the capitalization of net rentals" as a method for determining the fair market value of real estate for condemnation purposes, it follows that a breach of that warranty would have a direct bearing on the fair market value of the property. Nothing speculative is involved. A consequent adjustment of the purchase price would be within the contemplation of the parties at the time the contract was entered into. The injured buyers were thus entitled to be placed, as far as possible, in the position they would have occupied had there not been the breach of the contract.

We conclude, therefore, that the trial judge did not err in determining the damages sustained by the buyers as $21,901.44.

## II.

The seller sees a fatal variance between the allegation of the declaration and the proof presented. It bases this on the fact that the buyers in the first count of their declaration alleged:

"That because of the increase in the real estate assessment, when finally made on the completed project as described, there is no net return on the property and the resale value of the property has been greatly decreased."

The seller contends that based on the pleadings "it was incumbent on the [buyers] to prove that the property did

not throw off any cash flow, or at least a cash flow substantially less than 10% or 12%. The [seller] contend[s] that in all events, the [buyers] would have to prove that the cash flow was substantially less than 10 to 12%." The seller points out that the buyers established the value on the basis of what it would have been if the taxes had been as warranted at $2,900.00 and the value on the basis of a tax of approximately $5,000.00 and that this was a clear variance.

The seller apparently overlooks the fact that the buyers abandoned the first count of their declaration and rested on the breach of warranty in the second count, although it is true that the second count embraced the first count within it.

In *Duck v. Quality Custom Homes*, 242 Md. 609, 220 A. 2d 143 (1966), Judge Oppenheimer said for the Court:

"The Ducks contend that there was a material variance in that Quality failed to prove what it alleged in its pleadings and bill of particulars —the cost of a home and lot less certain credits. A bill of particulars becomes a part of the pleadings and is binding on the pleader, Maryland Rule 346 e, 2 Poe, *Pleading & Practice* § 116 (5th ed. 1925). While at one time the proof had to follow strictly the allegation, *Bryan v. Coursey*, 3 Md. 61, 66 (1852), now all that is required is substantial agreement between the pleadings and proof and there is no material variance unless there is disagreement in a matter essential to the claim. *Challenge Clothes Corp. v. Polski*, 181 Md. 590, 593, 31 A. 2d 309 (1943) and cases therein cited; 1 Poe, *supra*, § 712. In *Norris v. Graham*, 33 Md. 56 (1870), cited by the Ducks, the court found there would be a material variance if the plaintiff were allowed to prove the defendant liable on the underlying contract rather than as a guarantor as alleged. See also *Norris v. Ald New York, Inc.*,

227 Md. 110, 175 A. 2d 749 (1961), wherein the plaintiff was restricted to proof of a writing recited in his bill of particulars. Here Monje's testimony as to the computation of costs and the credits support the pleadings, which based the claim, not on a contract, but only on the common counts. Even if there is a special contract and the plaintiff has performed, he may declare on the common counts. *Bright v. Ganas,* 171 Md. 493, 497, 189 Atl. 427 (1937). We find no material variance." *Id.* at 613.

In *Challenge Clothes Corp. v. Polski,* 181 Md. 590, 31 A. 2d 309 (1943), cited by Judge Oppenheimer, Judge Delaplaine stated for the Court:

"It is a familiar rule of the common law that a plaintiff cannot recover if the evidence establishes a wholly different case from that alleged." *Id.* at 593.

Maryland Rule 301 (b) permits incorporation by reference. It is apparent in this case that by incorporating Count I in its entirety into Count II, more facts are alleged than is necessary to constitute a cause of action alleging breach of warranty. This could be handled in the usual case under Rule 301 (j) by a motion to strike as unnecessary. In this instance, as the purpose of incorporation by reference is to eliminate redundancy, the purpose of incorporation by reference would have been defeated by a motion to strike.

Thus viewed, it is seen that we are confronted not with a problem of variance, but with unnecessary pleading. To reach the result urged by seller would render incorporation by reference so cumbersome in the ordinary case that it would defeat the purpose of allowing such pleadings.

We do not perceive a material variance here between the pleadings and the proof under the second count of

the declaration where the breach of the warranty was specifically pleaded.

### III.

The buyers here seek to hold personally liable for the breach of warranty the directors of the seller corporation. They present no argument relative to anyone other than Brown. As to him they cite his statement, "I said, 'Well, put it in there; I don't care.'" as evidence of his total disregard of the truth or falsity of the warranty and say "his course of conduct of reckless indifference was tantamount to misrepresentation." It is to be noted, however, that they dropped their claim under the first count that alleged that "the defendants deceived and defrauded the plaintiffs."

The rule in Maryland is in accord with the general rule that in the absence of statute except where fraud is involved a corporate officer is not personally liable on a corporate contract with a third person. *Ace Development Co. v. Harrison*, 196 Md. 357, 366-367, 76 A. 2d 566 (1950); 19 Am.Jur.2d *Corporations* § 1341 (1965). See also *Purdum v. Edwards*, 155 Md. 178, 141 A. 550 (1928), where the president of a corporation and the corporation were held joint-tort feasors when land was sold from plats representing certain lots as separated by a broad driveway from a lake when in fact they were beneath the lake. See *Friedman v. Clark*, 252 Md. 26, 248 A. 2d 867 (1969), where a corporate officer made a personal guaranty and *Security Ins. Co. v. Mangan*, 250 Md. 241, 242 A. 2d 482 (1968), where an individual was held to be clearly signing in his capacity as a corporate officer and therefore not personally liable. See Code (1969 Cum. Supp.), Art. 23, § 62 for statutory liability of a director.

Here we have no action in tort as in *Purdum v. Edwards, supra,* or in *Levi v. Schwartz*, 201 Md. 575, 95 A. 2d 322, 36 A.L.R.2d 1241 (1953), but an action in contract. It may well be that Mr. Brown was careless. Carelessness is not equated, however, with fraud. On this record, however, there is nothing to show that short of a journey to the assessment office to ascertain if all units

80

had been assessed he had any way of knowing or reason for believing that all units had not been assessed.

Judgment should not have been entered against the individuals who were officers and directors of the corporation.

> *Judgment as to A. B. Corporation affirmed; judgments against Albert E. Brown, James E. Schoolfield and S. W. Harris reversed; appellant A. B. Corporation to pay the costs.*