885 A.2d 365

Jonathan EDENBAUM, et al.

v.

Klara SCHWARCZ–OSZTREICHERNE.

No. 1373, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Oct. 28, 2005.

**234**

Neil D. Intrater, Silver Spring, for appellant.

Geoffrey H. Genth (Dominick A. Garcia, on brief), Baltimore, for appellee.

Panel KENNEY, KRAUSER and THEODORE G. BLOOM, (Retired, specially assigned), JJ.

KRAUSER, J.

Appellant Jonathan Edenbaum and appellee Klara Schwarcz–Osztreicherne ("Schwarcz") comprise the officers, directors and shareholders of Liberty Assisted Living, Inc. ("Liberty"), a closely held Maryland corporation, which owns and operates an eight-bed assisted living facility. When Edenbaum, as President of Liberty, relieved Schwarcz of her duties as the facility's Director of Operations and discontinued her salary, Schwarcz filed a complaint in the Circuit Court for Montgomery County, claiming that Edenbaum and Liberty had breached their shareholders' agreement. Having received neither salary nor profits since her termination, she requested damages and the dissolution of the corporation.

Although the circuit court found that Edenbaum had rightfully removed Schwarcz as Director of Operations, it ruled that Schwarcz was, as a shareholder and director, entitled to post-termination salary and profits. Holding both Edenbaum and Liberty liable for those unpaid sums, it entered a judgment in favor of Schwarcz and against Liberty and Edenbaum, in the amount of $89,880.00. But, as for Schwarcz's request that Liberty be dissolved, it found that Edenbaum's conduct was not so "oppressive" as to justify Liberty's dissolution and, therefore, denied Schwarcz's request. Cross-appeals followed, in which Edenbaum and Liberty questioned the court's award of salary and profits to Schwarcz, and Schwarcz challenged the denial of her dissolution demand.

For our review, Edenbaum and Liberty present four issues. Reordered, they are:

I. Whether Schwarcz was entitled to continue receiving her salary after her employment was terminated.

II. Whether the circuit court erred in awarding Schwarcz corporate profits for years in which, appellants claim, there were no such no profits.

III. Whether the circuit court erred in holding Edenbaum personally liable for profits and salary allegedly owed Schwarcz.

IV. Whether the circuit court erred in refusing to apply the "avoidable consequences rule."

On cross-appeal, Schwarcz presents one question. Reworded, it is:

V. Whether the circuit court abused its discretion in declining to dissolve Liberty.

For the reasons that follow, we shall vacate the judgments of the circuit court awarding Schwarcz salary and profits, vacate the denial of Schwarcz's request for dissolution, and remand this case to the circuit court for it to clarify its findings as to Liberty's profits in 2002 and 2003 and to consider dissolution or other less drastic remedies under Md.Code (1975, 1999 Repl.Vol.), § 3–413(b)(2) of the Corporations and Associations Article ("Corps. & Ass'ns"). Having so held, we need not and, therefore, shall not reach the question of whether the circuit court erred in refusing to apply the "avoidable consequences rule."

### Background

In June 1999, Schwarcz, a geriatric nurse, and Susan Fehr–Smith, a Maryland businesswoman, formed Liberty Assisted Living, Inc., for the purpose of owning and operating an assisted living facility in Maryland. Fehr–Smith owned two-thirds of the corporation's stock, while Schwarcz owned one-third. To implement their plans, they converted a house they had purchased into an assisted living facility. But, before the first patient had moved into that facility, Fehr–Smith informed Schwarcz that she wished to sell her interest in the corporation.

Jonathan Edenbaum, who had experience in managing assisted living facilities, emerged as a potential purchaser of

Fehr–Smith's shares. Between December 2000 and early January 2001, Edenbaum and Schwarcz agreed that they would operate the business on a "50/50 basis."

On January 15, 2001, Edenbaum purchased most of Fehr–Smith's shares, giving him a 51% interest in Liberty, and Schwarcz purchased Fehr–Smith's remaining shares, increasing her interest in the corporation to 49%. At that time, Edenbaum and Schwarcz entered into a sparse, one-page agreement, entitled "Shareholder's [sic] Agreement." That agreement stated:

*Officers and Directors, Corporate Decisions, By–Laws, Charter:*

Jonathan and Klara be [sic] the two directors of the Company. Jonathan will be President, Secretary and Treasurer. Klara will be Vice President. Jonathan will be the Chief Executive Officer (CEO) and Klara will be the Director of Operations. All shareholder decisions will be made by simple majority; no super-majorities shall be required for any shareholder decision. Jonathan's vote will be controlling in any business decisions and/or disputes between the parties either as shareholders or directors. No action or vote of the shareholders or directors shall be valid without Jonathan's consent. The corporate charter and corporate by-laws shall be amended, and are hereby deemed to be amended, to reflect the provisions of the Shareholder's Agreement.

*Salaries:*

Jonathan and Klara will receive equal salaries (after bills have been paid for the month) and Jonathan will receive 50% profit and Clara [sic] will receive 50% profit.

*Jonathan's Responsibilities:*

Marketing of the facility and giving tours to prospective clients and their families, business management decisions, in charge of all bills, generate resident bills, oversee all paperwork of resident files, hiring of consultants, keeping house

in compliance with state and county regulations. Jonathan will have the final say in all business and corporate decisions.

*Klara's Responsibilities:*

Cooking and cleaning of the home, patient care, grocery shopping, transportation for residents, laundry and daily house maintenance.

*Joint Responsibilities:*

Resident activities, hiring staff, decision on accepting residents or denying, admission, family interactions.

*Bank Account and Bills:*

A bank account will be opened in the Company's name with Jonathan and Klara as joint signatories on the account. Klara may not authorize any vendors or pay any bills without Jonathan's approval.

In sum, the parties' agreement provided that both parties would be directors of the corporation; that Edenbaum would be President, Secretary, Treasurer, and Chief Executive Officer; and that Schwarcz would be Vice President and Director of Operations. It further stated that Edenbaum's vote would be "controlling in any business decisions and/or disputes between the parties either as shareholders or directors" and that Edenbaum would "have the final say in all business and corporate decisions."

The agreement also spelled out the parties' duties and responsibilities. While Edenbaum was responsible for paying "all bills," "generat[ing] resident bills," "hiring of consultants," "[m]arketing of the facility," making all "business management decisions," "oversee[ing] all paperwork of resident files," "giving tours to prospective clients and their families," and "keeping [the] house in compliance with state and county regulations," Schwarcz was responsible for the "[c]ooking and cleaning of the home, patient care, grocery shopping, transportation for residents, laundry and daily house maintenance."

The two shared responsibility for "[r]esident activities, hiring staff . . . accepting residents" and "family interactions." And finally, the agreement provided that Edenbaum and Schwarcz would receive "equal salaries" and share equally in the company's profits.

After a few months of operating the business together, Edenbaum grew increasingly dissatisfied with Schwarcz's performance as Director of Operations and with the behavior of Schwarcz's adult son, who resided at the facility with her. To end their association, Edenbaum proposed that one of them should purchase the other's stock. That proposal was followed by a letter dated September 4, 2001, in which Edenbaum presented Schwarcz with three options: either she would purchase his shares in Liberty for $125,000.00 in cash or he would purchase her shares for $65,000.00 in cash, or he would sell his shares to Susan Fehr–Smith and her husband. In the same letter, Edenbaum threatened that, if Schwarcz did not agree to one of the three options, she would be removed from her position as Director of Operations. If that occurred, he warned she would not receive any further salary, only share in the company's profits, if there were any. The letter apparently did not provoke the desired response. And, three weeks later, as promised, Edenbaum discharged Schwarcz from her position as Director of Operations and discontinued payment of her salary. Almost a year and a half after her termination, in February 2003, Schwarcz filed a complaint in the Circuit Court for Montgomery County against Edenbaum and Liberty, alleging breach of contract. Later, she added a request that Liberty be dissolved because of Edenbaum's "illegal, oppressive and/or fraudulent" conduct.

## Trial

A bench trial was held in June 2004. At that trial, nine witnesses testified,[1] but, for the purposes of this appeal, we

---

[1]. Those witnesses included: Iris Helfritch, Schwarcz's current employer; Anita Lieb, a licensed social worker employed by Montgomery County, who provided ombudsman services Liberty; Eileen Clark, the

are only concerned with the testimony of three: Edenbaum, Schwarcz, and Dennis Colson, an accountant.

### Edenbaum's Testimony

Edenbaum testified that when he first became a co-owner of Liberty, his relationship with Schwarcz "was good." But, after several months, their relationship changed. "All of a sudden she want[ed] weekends off, she want[ed] this, she want[ed] that, she want[ed] hired staff," he said. She also, according to Edenbaum, "never" provided him with "any receipts for the petty cash" or the "grocery shopping," as he requested. And she bought "all sorts of things, crazy kinds of gourmet foods, Hungarian foods for herself and her family and [did] not stick[ ] to the menu."

Despite repeatedly warning Schwarcz to stop "transcrib[ing] medications from doctors' orders because she really didn't know how," she continued the practice, Edenbaum testified. And, in violation of patient confidentiality, she would, according to Edenbaum, fax "incident reports and various things," which she composed in Hungarian, to her daughter, who would then translate them into English and fax them back. Edenbaum also expressed his agreement with three other witnesses [2] that Schwarcz had been "rough" with a patient in the shower, had "pick[ed]" another patient "up by a diaper" and had called another patient "ugly."

He further testified that Schwarcz's relationship with the rest of the staff "was not good." "She treated them as slaves," he explained, frightening and "demean[ing]" them.

Moreover, Edenbaum stated that he had had problems with Schwarcz's adult son, Vincent, who was living at Liberty with

sister of one of Schwarcz's former patients; Thomas Folup, Fehr–Smith's brother, who was involved in the formation of liberty; Roberta Castile, a registered nurse, who worked at Liberty with Schwarcz; and Bridget Kapomo, a certified nursing aide, who worked with Schwarcz at Liberty.

2. Those witnesses were Roberta Castile, Anita Lieb, and Bridget Kapomo.

Schwarcz. According to Edenbaum, Vincent was violent. He "scream[ed]" and "scared" the patients, Edenbaum claimed. When Edenbaum told Vincent he could not drink on the premises, Vincent threatened Edenbaum's life, and on other occasions "cussed [him] out," prompting Edenbaum to obtain a "peace order" in September 2001. "It was not," Edenbaum testified, "a peaceful, serene environment, which is what it should be for geriatric patients."

Edenbaum further testified that, in the years since he became a co-owner of Liberty, Liberty had had no "significant cash flow" or profits after all the bills and salaries were paid. In 2001, he and Schwarcz each received approximately $30,000.00 in salary. After Schwarcz's discharge, Edenbaum received, in 2002, almost $67,000.00. The increase occurred, he explained, because, after he relieved Schwarcz of her position as Director of Operations, he took over her duties and received her salary in addition to his own. As of the date of trial, Edenbaum had received in salary $24,750.00 for 2004.

### Schwarcz's Testimony

Schwarcz testified that she had never "done anything to threaten the safety of any resident" and denied that Edenbaum had ever approached her about her mistreatment of the residents. Furthermore, to her knowledge, no residents had ever complained about her son's behavior.

Schwarcz stated that, before she was relieved of her duties at Liberty, she and Edenbaum were both receiving salaries of $4000.00 a month, but that she had not received any money, in either salary or profits, from Liberty since her termination. She further testified that Edenbaum had not conducted any shareholders' or directors' meetings or provided her with any reports concerning Liberty's business since her termination.

### Colson's Testimony

Dennis Colson, Schwarcz's accountancy expert, testified regarding Liberty's tax returns and balance sheets for 2001 through 2003. He stated that, in 2001, Edenbaum's salary was $35,413.00, and Schwarcz's was $32,455.00, but after her

termination, Schwarcz received no salary or profits, while Edenbaum received a salary of $66,500.00 in 2002 and of $60,500.00 in 2003.

He further testified that, although Liberty had "profits" of approximately $9,400.00 in 2002 and $13,000.00 in 2003, the deductions it took for depreciation in those years created losses instead of profits. Liberty's tax returns, he pointed out, showed a $24,420.00 deduction for depreciation in 2002 and a $22,939.00 deduction for depreciation in 2003. Had Liberty not taken the deductions, the tax returns would have shown, he concluded, "profits" of approximately $9,400.00 in 2002 and $13,000.00 in 2003.

Later, however, Colson qualified his answer, stating that he was talking about "cash flow" and not "profits." He also conceded that Liberty's 2002 balance sheet showed approximately $14,400.00 in mortgage payments that were "not reflected in the loss number" on the 2002 tax return and that similar mortgage payments in 2003 were "not reflected in the loss number" on the 2003 tax return.

### Circuit Court's Ruling

When the trial concluded, the court ruled that, under the terms of the shareholders' agreement, Edenbaum had the right to relieve Schwarcz of her responsibilities at Liberty. But it declined to find that the shareholders' agreement constituted an employment contract, stating:

I do not find that this shareholders' agreement constitutes an employment contract. It is an agreement, which was created by two shareholders to this corporation. It provides how those shareholders will be paid. [It] provides that Mr. Edenbaum and Ms. Schwarcz will receive salaries and that Mr. Edenbaum and Ms. Schwarcz will receive 50 percent profit.

So, I do not find that this creates an employment contract or an employment agreement. This is a shareholders' agreement. And when Mr. Edenbaum made the decision to remove Ms. Schwarcz from the premises and relieve her

from the responsibilities that she had, that did not relieve Mr. Edenbaum or the corporation of its obligations to pay her as a director of the company under the salaries that had been agreed to in the shareholders' agreement.

The court awarded Schwarcz post-termination salary for 2002, 2003, and 2004, as well as the difference between Edenbaum's salary and hers in 2001. Then, relying on Colson's testimony, the court found that Liberty had profits in 2002 and 2003 and awarded Schwarcz 50% of what it calculated to be profits of $11,047.00. In total, the court awarded Schwarcz $89,880.00, and held Edenbaum and Liberty jointly and severally liable for that sum. In doing so, the trial judge stated:

I find that Ms. Schwarcz is entitled to judgment. I am going to enter judgment against each of the defendants in this case in the total amount of $89,880.00, which is broken down as follows: 2002 salary, 33,250; 2003 salary, 30,250; 2004 salary, 12,375, and one half of the difference in 2001 is $2,958.

I am also adding to that the testimony from the accountant, who testified as to what the profits would have been. And Ms. Schwarcz's 50 percent of the 2002 profits is $4,457; 2003, 50 percent of that profit is $6,500, for a total judgment in favor of the plaintiff against each of the defendants in the amount, jointly and severally, in the amount of $89,880.

Rejecting Schwarcz's claim that Edenbaum's conduct was oppressive, the trial judge observed:

I am not satisfied that Mr. Edenbaum engaged in oppressive conduct. He has the right under the shareholders' agreement to do what he did, he made a business decision to do it, and under the shareholders' agreement, he was in his right to do so ...

Ms. Schwarcz, no longer being a part of having those responsibilities assigned to her, however, is certainly entitled to be paid pursuant to the shareholders' agreement and it is not—her interest in the corporation isn't being divested, she is not being forced out of the corporation, and she is

still entitled to share in the profits and the salary that is being paid pursuant to the shareholders' agreement.

The trial judge then concluded:

So, I do not see the conduct of Mr. Edenbaum as constituting oppression, so I will not order a dissolution.

### Standard of Review

■ The standard of review for a non-jury trial is governed by Maryland Rule 8–131. That rule provides that this Court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). In reviewing the circuit court's findings, we view the evidence " 'in a light most favorable to the prevailing party.' " *Gen. Motors Corp. v. Schmitz,* 362 Md. 229, 234, 764 A.2d 838 (2001)(quoting *Ryan v. Thurston,* 276 Md. 390, 392, 347 A.2d 834 (1975)).

■ While the factual determinations of the circuit court are afforded significant deference on review, its legal determinations are not. " '[T]he clearly erroneous standard for appellate review in [Maryland Rule 8–131(c) ] does not apply to a trial court's determinations of legal questions.' " *Ins. Co. of N. Am. v. Miller,* 362 Md. 361, 372, 765 A.2d 587 (2001)(quoting *Heat & Power Corp. v. Air Prods. & Chem. Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990)). The appropriate inquiry for such determinations is whether the circuit court was "legally correct." *Md. Envtl. Trust v. Gaynor,* 140 Md. App. 433, 440, 780 A.2d 1193 (2001), *rev'd on other grounds,* 370 Md. 89, 803 A.2d 512 (2002).

### Discussion

#### I.

The circuit court held that the Edenbaum–Schwarcz shareholders' agreement was a shareholders' agreement, not an employment contract. Therefore, as either a shareholder or a director (the court was not altogether clear in which capaci-

ty),[3] Schwarcz was entitled to continue to receive her salary after she was terminated as Director of Operations. Edenbaum and Liberty claim, however, that the shareholders' agreement was in part an employment agreement, that Schwarcz was receiving her salary, under that agreement, as Director of Operations, and that, once she was lawfully terminated from that position, she was no longer entitled to receive a salary for a position she no longer occupied. We find much merit to their position.

As noted, Liberty is a closely held corporation. Unlike "close corporations," which are defined by statute in Maryland,[4] a closely held corporation has "no single, generally accepted definition." *Donahue v. Rodd Electrotype Company of New England,* 367 Mass. 578, 328 N.E.2d 505, 511 (1975). However, closely held corporations commonly possess the following attributes: "(1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation." *Donahue,* 328 N.E.2d at 511; *see* F. Lodge O'Neal & Robert B. Thompson, O'Neal & Thompson's Close Corporations and LLCs: Law and Practice § 1:2, 4–5 (3d ed.2004).

---

**3.** The court ruled as follows, at one point seemingly awarding Schwarcz post-termination salary as a shareholder, at another point making that award to her as corporate director:

> I do not find that this shareholders' agreement constitutes an employment contract. It is an agreement, which was created by two shareholders to this corporation. It provides how those *shareholders will be paid.* [It] provides that Mr. Edenbaum and Ms. Schwarcz will receive salaries and that Mr. Edenbaum and Ms. Schwarcz will receive 50 percent profit.
>
> So, I do not find that this creates an employment contract or an employment agreement. This is a shareholders' agreement. And when Mr. Edenbaum made the decision to remove Ms. Schwarcz from the premises and relieve her from the responsibilities that she had, that did not relieve Mr. Edenbaum or the corporation of its obligations to *pay her as a director* of the company under the salaries that had been agreed to in the shareholders' agreement. (Emphasis added).

**4.** *See* Maryland Code (1975, 1999 Repl.Vol.), §§ 4–101 to 4–603 of the Corporations and Associations Article regarding close corporations.

Shareholder agreements of closely held corporations, among other things, usually mandate the structure of the business's management; name the officers and directors of the corporation; spell out the voting rights of the shareholders; outline when, to whom and under what conditions a shareholder may sell his or her shares; establish a "method or formula for fixing the purchase price of shares"; and govern the operation of the enterprise. Kerry M. Lavelle, *Drafting Shareholder Agreements for the Closely–Held Business*, 4 DePaul Bus. L.J. 109, 112–17, 120 (1991); *see* Harry G. Henn & John R. Alexander, Laws of Corporations, § 198 (3d ed.1983). Because shareholders' agreements commonly provide for the corporation to purchase shares when certain events occur (such as death of a shareholder), the corporation itself is usually a party to such an agreement. *Id.* at 111.

The Edenbaum–Schwarcz shareholders' agreement was, in one sense, more modest in scope than a typical shareholders' agreement and, in another sense, more expansive. It did not provide for shareholders' voting rights, or outline when, to whom and under what conditions a shareholder may sell his or her shares. Nor did it provide a method or formula for fixing the purchase price of shares. But, unlike a pure shareholders' agreement, it did set forth the positions, duties, and salaries of the corporate officers and employees, that is, the duties of Edenbaum and Schwarcz. Consequently, Edenbaum and Liberty claim that the shareholders' agreement was not merely a shareholders' agreement, but an employment agreement as well: one between Schwarcz and the corporation. Although the corporation was not formally named as a party to the agreement, it is Edenbaum's position that he signed the shareholders' agreement as an officer, "employing" Schwarcz as Liberty's Director of Operations.

That a shareholders' agreement may also constitute an employment agreement has been implicitly recognized by this Court in *Goerlich v. Courtney Industries, Inc.,* 84 Md.App. 660, 581 A.2d 825 (1990). In *Goerlich,* we affirmed the circuit court's dismissal of a malpractice action brought by a terminated shareholder-employee against the attorney-drafter of a

shareholders' agreement, which the shareholder-employee had believed provided him with employment for so long as the corporation endured. In doing so, we stated that, because of the indefinite nature of his employment under the shareholders' agreement, he was at most an employee at-will and could therefore be discharged from his employment at any time.

 Although the court below did not address the question whether Schwarcz was an at-will employee of Liberty, it did state that Edenbaum "was within his right," under the shareholders' agreement, to "remove[ ] Ms. Schwarcz from her responsibilities" as Director of Operations, because Edenbaum had "the final say," under that agreement, "in all business and corporate decisions." In short, Edenbaum had the right, granted him by the shareholders' agreement, to discharge Schwarcz from her position with the company. To later state, as the circuit court did, that the agreement was not an employment agreement is incongruous. If Schwarcz can be discharged under the terms of an agreement, then whatever that agreement was formally called, it was, in part at least, an employment agreement, because it governed the termination of her employment.

Moreover, the agreement assigned no duties to Schwarcz as a director of the corporation, but it did as Director of Operations. Her responsibilities, as Director of Operations, encompassed all those things that ensured the smooth operation of the facility, including "cooking and cleaning of the home, patient care, grocery shopping, transportation of residents, laundry and daily house maintenance," as well as duties she shared with Edenbaum, such as "resident activities, hiring staff, decision on accepting residents or denying, admission, family interaction." Thus, the "salary" she was to receive was clearly intended to compensate for her work in that capacity.

Schwarcz's relationship to the corporation, as Director of Operations, fits, of course, the very definition of employment: "Employment is a relationship created expressly or impliedly by an agreement calling for the employee to perform work under the control of the employer in return for some consider-

ation by the employer." Stanley Mazaroff & Todd Horn, Maryland Employment Law § 3.01(1) (2d ed.2004). To form an employment contract, "[a]t a minimum, the parties must agree to the work to be performed by the employee and the consideration the employer will give in return for this work." *Id.*

Here, the shareholders' agreement stated both the work that Schwarcz was to perform, under the control of Edenbaum as Chief Executive Officer, and the consideration she would be paid for that work. As the canons of contract construction require us to ascertain the intent of the contracting parties, *Society of Am. Foresters v. Renewable Natural Resources Found.*, 114 Md.App. 224, 234, 689 A.2d 662 (1997), and, in doing so, to interpret a contract as a whole, *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508, 667 A.2d 617 (1995), we can reach no other conclusion but that the shareholders' agreement was also an employment agreement.

Whether it was an at-will agreement, we need not decide, because appellee has not cross-appealed on the grounds that she was wrongfully discharged. Suffice it to say that upon her discharge, unless otherwise provided by contract, she was not entitled to post-termination wages. And, here, the contract did not provide otherwise.

Nor was she to receive her salary as a shareholder. The shareholders' agreement provided that Edenbaum and Schwarcz were to "receive equal salaries" and each would receive 50% of the profits. "Salary" is defined as "a fixed payment at regular intervals for services." Webster's New World Dictionary (2d College ed.1984). That the agreement distinguished between "salary" and "profit" indicates that the intent of the agreement was that the salary was to compensate Edenbaum and Schwarcz for the services they rendered the company, and profits were to compensate them as owners of the corporation. Thus, because there is no dispute that Schwarcz's employment with Liberty was lawfully terminated, and because the agreement did not provide that she would receive her salary after termination, the circuit court was

legally incorrect in awarding Schwarcz post-termination salary.

## II.

[5] Edenbaum and Liberty contend that the circuit court "awarded non-existent profits to Ms. Schwarcz" because, they insist, there were no profits to be awarded. The testimony upon which the court relied, in awarding a portion of the corporate profits, was Dennis Colson's. While Colson testified that, had Liberty's tax returns and balance sheets not included depreciation deductions in 2002 and 2003, they would have shown "profits" of approximately $9,400.00 and $13,000.00, respectively, he admitted on cross-examination that the mortgage payments made by Liberty in 2002 and 2003 were "not reflected in the loss figures" and those payments erased the "profits."

It was certainly within the court's discretion to rely on the first part of Colson's testimony and not what followed, but the record does not reflect it did. If, in fact, the court did rely on Colson's testimony in *toto,* it should have arguably concluded, as Edenbaum and Liberty maintain, that there were no profits to be distributed. Consequently, we must vacate the award of profits and remand the matter to the circuit court on this issue for it to clarify why it held as it did. In other words, did it intentionally or inadvertently not take into account the mortgage payments made by the corporation when it calculated corporate profits?

## III.

Edenbaum contends that the circuit court erred in holding him personally liable for the salary and profits the court awarded Schwarcz. Because the shareholders' agreement "did not involve the parties in their individual capacities" and the "rights and duties [provided for in the agreement] all stemmed from the corporation," Edenbaum claims he could not have "be[en] held personally liable for his acts as a corporate officer or shareholder," in the absence of fraud. As

Schwarcz did not pursue a fraud claim at trial, there was no basis, he asserts, upon which to hold him personally liable for what were the corporation's obligations.

█ Edenbaum and Schwarcz's agreement was really three agreements in one: two employment agreements, one between Edenbaum and Liberty and the other between Schwarcz and Liberty; and a shareholders' agreement between Edenbaum and Schwarcz describing the duties, responsibilities, and entitlements of each. Schwarcz sued Edenbaum and the corporation for unpaid salary and profits, both of which were corporate responsibilities. While Schwarcz was working at Liberty, she was an employee of Liberty, not Edenbaum. Her salary was paid by Liberty, not Edenbaum. And the profits, if there were any, were Liberty's, not Edenbaum's. In short, paying salary and profits to Schwarcz was the responsibility and obligation of Liberty, not Edenbaum.

█ Indeed, in the absence of fraud, "a corporate officer is not personally liable on a corporate contract with a third person." *A.B. Corporation v. Futrovsky*, 259 Md. 65, 79, 267 A.2d 130 (1970). Thus, Edenbaum, as an officer of Liberty, could not be held personally liable for breach of the employment contract between Liberty and Schwarcz, as no claim of fraud was advanced at trial.

As a director of Liberty, Edenbaum was also shielded from personal liability so long as he was acting in "good faith," "in the best interests of the corporation," and "[w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances." Corps. & Ass'ns § 2–405.1(c);[5] Md.Code (1973, 1998 Repl.Vol.), § 5–417 of the

---

5. Corporations and Associations § 2–405.1 provides, in part:
 (a) A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:
 (1) In good faith;
 (2) In a manner he reasonably believes to be in the best interests of the corporation; and
 (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

Courts and Judicial Proceedings Article ("Cts. & Jud. Proc.").[6] Schwarcz does not now argue, and the circuit court did not find, that Edenbaum violated the standard of care of a corporate director. In fact, the circuit court found that Edenbaum "was within his right ... under the terms of the shareholder[s'] agreement" to terminate Schwarcz. Thus, Edenbaum could not be held personally liable as a director.

▮ Nor could he be held personally liable as a shareholder. The "general rule is that shareholders are not held liable for debts or obligations of the corporation except where it is necessary to prevent fraud or enforce a paramount equity." *Damazo v. Wahby*, 259 Md. 627, 633, 270 A.2d 814 (1970). As Schwarcz does not claim either "fraud" or invoke "paramount equity," the circuit court erred in holding Edenbaum personally liable for Schwarcz's claim for unpaid salary and profits.

(b)(1) In performing his duties, a director is entitled to rely on any information, opinion, report, or statement, including any financial statement or other financial data, prepared or presented by:

(i) An officer or employee of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

(ii) A lawyer, certified public accountant, or other person, as to a matter which the director reasonably believes to be within the person's professional or expert competence; or

(iii) A committee of the board on which the director does not serve, as to a matter within its designated authority, if the director reasonably believes the committee to merit confidence.

(2) A director is not acting in good faith if he has any knowledge concerning the matter in question which would cause such reliance to be unwarranted.

(c) A person who performs his duties in accordance with the standard provided in this section shall have the immunity from liability described under § 5–417 of the Courts and Judicial Proceedings Article.

6. Courts and Judicial Proceedings § 5–417.1 states:

A person who performs the duties of that person in accordance with the standard provided under § 2–405.1 of the Corporations and Associations Article has no liability by reason of being or having been a director of a corporation.

## IV.

Having concluded that the circuit court was legally incorrect in awarding Schwarcz her salary for the time after she was terminated, we do not reach the question of whether the circuit court erred in refusing to apply the "avoidable consequences rule."

### *Cross–Appeal*

## V.

In her cross-appeal, Schwarcz contends that the circuit court abused its discretion in dismissing her request for involuntary dissolution of Liberty. The court, she argues, should have granted that request "on the ground that Mr. Edenbaum engaged in 'oppressive' conduct" because his conduct "substantially defeat[ed][her] reasonable expectations as a shareholder."

The standard we apply in reviewing the grant or denial of a petition for involuntary dissolution is whether the circuit court in rendering its decision abused its discretion. *Renbaum v. Custom Holding, Inc.*, 386 Md. 28, 43, 871 A.2d 554 (2005). Under that standard, "[w]e will not reverse a ruling ... simply because we would have made a different ruling had we been sitting as trial judges." *Das v. Das*, 133 Md.App. 1, 16, 754 A.2d 441 (2000). Indeed, under the "abuse of discretion" standard, we will not vacate a circuit court's judgment unless " 'no reasonable person would take the view adopted by the [trial] court.' " *Id.* at 15, 754 A.2d 441 (quoting *North v. North*, 102 Md.App. 1, 13–14, 648 A.2d 1025 (1994)).

Corporations and Associations § 3–413 sets forth the grounds upon which a stockholder may petition a court to dissolve a corporation. It provides:

(a) Stockholders entitled to cast at least 25 percent of all the votes entitled to be cast in the election of directors of a corporation may petition a court of equity to dissolve the corporation on grounds that:

(1) The directors are so divided respecting the management of the corporation's affairs that the votes required for action by the board cannot be obtained; or

(2) The stockholders are so divided that directors cannot be elected.

(b) Any stockholder entitled to vote in the election of directors of a corporation may petition a court of equity to dissolve the corporation on grounds that:

(1) The stockholders are so divided that they have failed, for a period which includes at least two consecutive annual meeting dates, to elect successors to directors whose terms would have expired on the election and qualification of their successors; or

(2) The acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent.

(c) Any stockholder or creditor of a corporation other than a railroad corporation may petition a court of equity to dissolve the corporation on grounds that it is unable to meet its debts as they mature in the ordinary course of its business.

Corporations and Associations § 3–413.

Because Schwarcz relies solely on Corps. & Ass'ns § 3–413(b)(2) in claiming that dissolution was warranted because of Edenbaum's "oppressive" conduct, we shall confine our review to that subsection of the statute. It permits "[a]ny stockholder entitled to vote in the election of directors of a corporation" to petition a court to dissolve the corporation on the ground that the "acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent."

"Oppressive" conduct is not defined by the statute. But, as it is singled out as a separate category of conduct justifying corporate dissolution by Corps. & Ass'ns § 3–413(b)(2), we surmise that it does not necessarily involve "fraudulent" or "illegal" conduct. *See White v. Perkins,* 213 Va. 129, 189 S.E.2d 315, 319 (1972)(stating that "oppressive" "is not synonymous with 'illegal' and 'fraudulent' "). "Oppressive" conduct has been described by other jurisdictions as:

burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.

*Baker v. Commercial Body Builders, Inc.*, 264 Or. 614, 507 P.2d 387 (1973); see F. Hodge O'Neal & Robert B. Thompson, O'Neal & Thompson's Oppression of Minority Shareholders and LLC Members, § 7:13, 96 (Revised 2d ed.2004); *Kisner v. Coffey*, 418 So.2d 58, 60 (Miss.1982); *Skierka v. Skierka Bros., Inc.*, 192 Mont. 505, 629 P.2d 214, 221 (1981); *Masinter v. WEBCO Co.*, 164 W.Va. 241, 262 S.E.2d 433, 440 (1980).

"Oppression," however, has also been defined by one Maryland commentator as "conduct that substantially defeats the reasonable expectations of a stockholder." James J. Hanks, Jr. Maryland Corporation Law § 11.7(b)(1990, 2004 Supp.). Or, in the more precise terminology of one of our sister states, "conduct that substantially defeats the 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." *Matter of Kemp & Beatley, Inc.*, 64 N.Y.2d 63, 484 N.Y.S.2d 799, 473 N.E.2d 1173, 1179 (1985).

This so-called "reasonable expectations" view has been adopted, either as the sole test of oppressive conduct or as one such test, by a number of other state courts. O'Neal & Thompson, Oppression of Minority Shareholders, *supra* § 7:13, 97; *see Kiriakides v. Atlas Food Systems & Services*, 343 S.C. 587, 541 S.E.2d 257 (2001); *Stefano v. Coppock*, 705 P.2d 443, 446 n. 3 (Alaska 1985); *Meiselman v. Meiselman*, 309 N.C. 279, 307 S.E.2d 551 (1983); *Fox v. 7L Bar Ranch Company*, 198 Mont. 201, 645 P.2d 929, 933–34 (1982); *Matter of Taines*, 111 Misc.2d 559, 444 N.Y.S.2d 540 (N.Y.1981); *Matter of Topper v. Park Sheraton Pharmacy*, 107 Misc.2d 25, 433 N.Y.S.2d 359 (N.Y.1980); *Capitol Toyota v. Gervin*, 381 So.2d 1038 (Miss.1980); *Exadaktilos v. Cinnaminson Realty Co.*, 167 N.J.Super. 141, 400 A.2d 554 (1979); *Balvik v.*

*Sylvester*, 411 N.W.2d 383, 387 (N.D.1987). As we shall see, this approach has much to recommend it.

As we noted earlier, the typical characteristics of a closely held corporation are: "(1) a small number of stockholders; (2) no ready market for the corporate stock; and (3) substantial majority stockholder participation in the management, direction and operations of the corporation." *Donahue*, 328 N.E.2d at 511. "As thus defined, the [closely held] corporation bears striking resemblance to a partnership,"[7] and "[c]ommentors and courts have noted that [it] is often little more than an 'incorporated' or 'chartered partnership.'" *Id.* at 512; *see Meiselman*, 307 S.E.2d at 557; O'Neal & Thompson, Close Corporations and LLCs, *supra* § 1:2 at 7–8.

Furthermore, "it is generally understood that, in addition to supplying capital and labor to a contemplated enterprise and expecting a fair return, parties comprising the ownership of a [closely held] corporation expect to be actively involved in its management and operation." *Balvik*, 411 N.W.2d at 386. "Unlike the typical shareholder in a publicly held corporation, who may simply be an investor or a speculator and does not desire to assume the responsibilities of management, the shareholder in a [closely held] corporation considers himself or herself as a co-owner of the business and wants the privileges and powers that go with ownership." *Id.* Employment by the corporation is one such privilege and often is the shareholder's main source of income. *Id.* at 386. Moreover, " 'providing for employment may have been the principal reason why the shareholder participated in organizing the corporation.'" *Id.* (quoting 1 F. O'Neal & R. Thompson, O'Neal's Close Corporations § 1.07, 25 (3d ed.1987)).

But the very nature of a closely held corporation makes it possible for a majority shareholder to "freeze out" a minority

---

7. A partnership is "an association of two or more persons to carry on as co-owners a business for profit . . ." Md.Code (1975, 1999 Repl.Vol.), § 9A–101(i) of the Corporations and Associations Article ("Corps. & Ass'ns"). Partners may enter into a partnership agreement which "governs" the partnership. Corps. & Ass'ns § 9A–103(a).

shareholder, that is, " 'deprive a minority shareholder of her interest in the business or a fair return on her investment.' " *Id.* "The limited market for stock in a [closely held] corporation and the natural reluctance of potential investors to purchase a noncontrolling interest in a [closely held] corporation that has been marked by dissension can result in a minority shareholder's interest being held 'hostage' by the controlling interest, and can lead to situations where the majority 'freeze out' minority shareholders by the use of oppressive tactics." *Id.*

▮▮▮▮▮▮ Because of the "predicament" a minority shareholder is in when a freeze out occurs, *id.* at 387, courts have looked at a majority shareholder's alleged "oppressive" conduct, in terms of the " 'reasonable expectations' held by minority shareholders in committing their capital to the particular enterprise." *Matter of Kemp & Beatley,* 473 N.E.2d at 1179–80. The "reasonable expectations" view of oppressive conduct "[r]ecogniz[es] that a minority shareholder who reasonably expects that ownership in the corporation would entitle him to a job, a share of the corporate earnings, and a place in corporate management would be 'oppressed' in a very real sense [sic] when the majority seeks to defeat those expectations and there exists no effective means of salvaging the investment." *Balvik,* 411 N.W.2d at 387. But, we caution, "oppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the petitioner's decision to join the venture." *Matter of Kemp & Beatley,* 473 N.E.2d at 1179. It "should not be deemed oppressive simply because the petitioner's subjective hopes and desires in joining the venture are not fulfilled." *Id.* That is to say, "[d]isappointment alone should not necessarily be equated with oppression." *Id.*

Schwarcz testified that she founded Liberty with Fehr–Smith with the expectation that she would be employed by the corporation, share in corporate earnings, and have a place in corporate management. And those expectations were not

disturbed, when a substitution of majority shareholders occurred: Edenbaum for Fehr–Smith. Indeed, at that time, her expectations were memorialized in the Edenbaum–Schwarcz shareholders' agreement, which provided that she would be employed as its Director of Operations with specified duties and at a salary equal to Edenbaum's. Moreover, as an officer and director of Liberty, she expected to continue to participate in shareholders' meetings and receive company reports. All that apparently ended when she was terminated from her position as Director of Operations. Her termination substantially defeated her reasonable expectations that she would be employed by the corporation, receive a salary, and take part in its management. That does not mean, however, that the circuit court abused its discretion in failing to proceed with the dissolution of Liberty upon her request.

"Because one benefit of a corporation is that it may have a perpetual life," we are reminded by the Court of Appeals that "the demise of a corporation is regulated as an extraordinary action under Title 3 of the Article." *Renbaum*, 386 Md. at 48–49, 871 A.2d 554. Indeed, a receiver is usually appointed to oversee the liquidation of a corporation. Corps. & Ass'ns § 3–415(2). Although he or she may continue the corporate business, Corps. & Ass'ns § 3–15(d), his or her appointment " 'is generally equivalent to a suspension of … corporate functions, and of all authority over [the corporation's] property and effects, and is also equivalent to an injunction restraining [the corporation's] agents and officers from intermeddling with its property.' " *Hamzavi v. Bowen*, 126 Md.App. 492, 497, 730 A.2d 274 (1999)(internal citation omitted). Moreover, "[i]n a sense, a forced dissolution allows minority shareholders to exercise retaliatory oppression against the majority." *Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 274 (Alaska 1980). Little wonder that courts are hesitant to order dissolution of an on-going business if a "less drastic" alternative can be fashioned. *Masinter*, 262 S.E.2d at 439; *see Lerner v. Lerner*, 306 Md. 771, 789, 511 A.2d 501 (1986)(quoting *Davis v. United States Electric Power & Light Co.*, 77 Md. 35, 40, 25 A. 982 (1893)("[t]he power is a discretionary one, to be exercised with

great circumspection, and only in cases where there is fraud or spoilation, or imminent danger of the loss of property . . .")).

■■■ While Corps. & Ass'ns § 3–413 only mentions dissolution as a remedy for oppressive conduct, we join other courts today "which have interpreted their similar statutory counterparts to allow alternative equitable remedies not specifically stated in the statute." *Balvik*, 411 N.W.2d at 388; *see Alaska Plastics v. Coppock*, 621 P.2d 270, 274–75 (1980). Alternative forms of equitable relief were outlined by the Supreme Court of Oregon in *Baker*, 507 P.2d at 395–96. *See Masinter*, 262 S.E.2d at 441. They include:

(a) The entry of an order requiring dissolution of the corporation at a specified future date, to become effective only in the event that the stockholders fail to resolve their differences prior to that date;

(b) The appointment of a receiver, not for the purposes of dissolution, but to continue the operation of the corporation for the benefit of all the stockholders, both majority and minority, until differences are resolved or "oppressive" conduct ceases;

(c) The appointment of a "special fiscal agent" to report to the court relating to the continued operation of the corporation, as a protection to its minority stockholders, and the retention of jurisdiction of the case by the court for that purpose;

(d) The retention of jurisdiction of the case by the court for the protection of the minority stockholders without appointment of a receiver or "special fiscal agent";

(e) The ordering of an accounting by the majority in control of the corporation for funds alleged to have been misappropriated;

(f) The issuance of an injunction to prohibit continuing acts of "oppressive" conduct and which may include the reduction of salaries or bonus payments found to be unjustified or excessive;

(g) The ordering of affirmative relief by the required declaration of a dividend or a reduction and distribution of capital;

(h) The ordering of affirmative relief by the entry of an order requiring the corporation or a majority of its stockholders to purchase the stock of the minority stockholders at a price to be determined according to a specified formula or at a price determined by the court to be a fair and reasonable price;

(i) The ordering of affirmative relief by the entry of an order permitting minority stockholders to purchase additional stock under conditions specified by the court;

(j) An award of damages to minority stockholders as compensation for any injury suffered by them as the result of "oppressive" conduct by the majority in control of the corporation.

*Id.* at 396–96, 262 S.E.2d 433 (internal citations and footnotes omitted).

Given that the circuit court did not find Edenbaum acted in bad faith and that Liberty is an on-going business, the circuit court did not abuse its discretion in denying Schwarcz's request to dissolve Liberty. But we shall remand this case to the circuit court to consider alternative remedies to dissolution, though dissolution itself remains an ultimate remedy should none of the others prove feasible.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. FIFTY PERCENT OF THE COSTS TO BE PAID BY APPELLANTS AND FIFTY PERCENT TO BE PAID BY APPELLEE.**